**COX v. FARLEY et al. (two cases).**

District Court, S. D. New York.

July 30, 1940.

447

Purrington & McConnell, of New York City (Frank J. McConnell and James D. Brown, both of New York City, of counsel), for libellant.

Irving L. Evans, of New York City, for respondents.

KNOX, District Judge.

These are libels in personam, brought by the consignee upon order ocean bills-of-lading, for cargo damage. Inasmuch as the facts in each case are quite similar, the suits, for convenience, were tried together. I shall treat them as one and use, wherever possible, the singular.

The subject of the libel is fresh asparagus, of a variety known as "Mary Washington," which is the one usually sold in this, the Eastern, market, and which is supplied, up to about 90 percent thereof, from California. In this case, this same variety was grown in Argentina during the *summer* season there, shipped from Buenos Aires to New York City, arriving here during our *winter* season.

It is necessary to go back to the time of harvesting in order to give a complete picture, because, on arrival, about *one-half* of each of the asparagus shipments was in a moldy, decayed condition, some cases being sweat stained and some frozen, the damaged asparagus being mixed with the good throughout the stow, and a substantial portion of the shipments was, therefore, condemned.

After harvesting, the asparagus was taken to a covered shed, there to be cleaned, assorted, put into two pound bunches, stacked butt-end on damp moss, packed

twelve bunches to a crate. The crates were then removed to a "cool" cellar to await transportation to a cold storage plant in Buenos Aires. The temperature in the field averaged about 73°F in the "American Legion" shipment and about 86°F in the "Pan America" consignment, while in the cellar, the thermometer readings were about 63°F and 73°F, respectively. After each day's harvesting, the crates were shipped in ordinary, non-refrigerated cars, with slats at the top for ventilation, via railroad to Buenos Aires, about eight or nine hours distant. Upon arrival at that port, the asparagus was unloaded into open auto trucks, covered with tarpaulins and taken to a cold storage plant where they were held at 34°F until transferred, again by auto truck, into the refrigerated hold of the vessel, previously cooled at 35°F, pursuant to the shipper's request. This was the procedure for each day's shipment, except the last, when the crates were transferred directly from the depot to the hold.

The total time from harvesting and first cooling at Buenos Aires was about eighteen to twenty hours, the time from the depot to the cold storage plant about one-half hour, and from the cold storage plant into the hold, about ten to fifteen minutes.

The proof is that the asparagus was inspected by the packer and found to be in good condition. The further proof is, that upon arrival of each day's shipment at the cold storage plant, another inspection was had by the "Port Chief of Vegetables, Department of Vegetable Sanitation, Ministry of Agriculture of the Argentine Republic," which examination was had in this fashion: Of each day's shipment, averaging about fifty crates, two or three crates were opened, and of these two or three crates, two or three bunches were opened and examined. It was upon this basis that the shipments were inspected and found in apparent good order and condition. It appears that the method of sampling and inspection was adequate, and further that, upon each day's inspection, which was on the day following harvesting, all the asparagus was in good condition.

On the date the vessel sailed, all of the crates were put into the hold, so that, at *that* time, the asparagus averaged four days old in the "American Legion" shipment, and seven days in the "Pan America" shipment. At all times during the period that the asparagus was at the cold storage plant in Buenos Aires, the tempera-

ture was maintained at 34°F.

In connection with the inspection by the Port Chief of Vegetables, it is important to note that the export certificates were issued a day or two before the vessel sailed. In order to obtain these certificates, and pursuant to regulations of the Ministry, the shipper "must register well in advance of shipment." This was done in these instances, so that "blanket" export certificates were issued for the estimated entire shipment, and as respects both shipments, the certificates which were actually granted covered a number of crates well in excess of the actual amount shipped. The certificates purport to certify that the exported asparagus conformed to the regulations relating to packing, grading, *pre-cooling,* etc., and that: "All lots of asparagus, which in order to arrive at the port of destination, must be shipped in refrigerating compartments, shall be subjected to a *pre-cooling* process of not less than *24* hours before being shipped, subject to the penalty that otherwise the exportation will be forbidden until this requirement has been complied with." (Article 13)

There is some doubt as to whether under the foregoing requirement, the asparagus should have been pre-cooled immediately upon the harvesting, or that it was contemplated that the pre-cooling should take place at Buenos Aires before the vegetable was put on board the ships.

Respondents contend that the bad outturn was due to the failure of the shipper to pre-cool immediately after harvesting, and that the failure to do so, together with the long railway journey in non-refrigerated cars, gave the asparagus an opportunity to lose much of its strength, and that it went on board in a condition where damage upon arrival at New York was to be anticipated.

Asparagus unquestionably is highly perishable, and the danger of mold and decay within the first twenty-four hours after harvesting is great. Indeed, it is said that no other vegetable deteriorates so rapidly at ordinary temperatures. This is borne out, not only by the oral testimony given at the trial, but by various pamphlets and bulletins published by scientific institutions, and also by the Refrigerating Data book of the American Society of Refrigerating Engineers. These scientific documents, to which I refer, are Bulletin No. 600, April, 1936, of the University of California, College of Agriculture, entitled "Pre-cooling and Shipping California Asparagus," and Bulletin No. 602, May, 1934, reprinted March, 1937, of the Agricultural Station at Cornell University, entitled "Studies on Cold Storage of Vegetables."

An excerpt from the refrigeration Data book mentioned above is as follows: "Asparagus loses much of its food value and therefore its salability within a few *hours* after cutting unless kept at a relatively low temperature. If the bunches are stood on damp packing and stored at 32°F *immediately* after cutting, this commodity should keep in good condition 3 to 4 weeks. If received at the storage plant after a long haul from a distant point of production, it should not be expected to keep longer than 3 to 6 days."

The general consensus of opinion seems to be that asparagus, if subjected to a temperature of about 32°, may be maintained in good condition for about twenty-eight days.

Upon arrival of the shipment on the American Legion, the asparagus had an age of 24 days and that of the Pan America, 28 days. There was, consequently, a fair chance that it would have begun to deteriorate, irrespective of negligence upon the part of the respondents.

Under ordinary conditions, it might well be that respondents should be exonerated. But, there was, upon each of these ships, a situation which leads me to believe that libellants should prevail. I say this by reason of the indisputable fact that some of the asparagus in each shipment was frozen upon its out-turn. Each shipment was stored in a refrigerating chamber which had been originally constructed for the purpose of carrying frozen meat or poultry, and which was not adapted to the preservation of vegetables. Within these coolers there was no fresh air ventilation, and no humidity was supplied them after the brine boxes were sealed at Buenos Aires. Neither were the chambers opened during the course of the voyage. Each day frequent temperature readings were taken from electrical thermometers located outside of the cooling room. These thermometers seem to have been tested at New York prior to the voyages in question. The readings were logged in pencil and the daily smooth log, in abbreviated form, was typed and signed by the Chief Freezer's Yeoman, and signed by the Chief Freezer. The pencil records on the rough log sheets are not in evidence, having been lost or

destroyed when, prior to this suit, the ownership of the vessel was transferred to the United States Maritime Commission.

The smooth log sheets indicate that the temperatures in the cooling chambers never varied from 35°F.

When one takes into account certain factors that would tend to affect the cooling room temperatures, I am forced to the conclusion that the log sheets did not truly reflect the actual temperatures within the refrigerators. Among these factors were—sea and air temperature over the course of voyages extending from below the equator to the winter temperatures of New York; compressor revolutions; and variations in brine temperature and valve regulation.

Without attempting an analysis of the voluminous testimony having to do with these matters, the fact that ice had formed upon some of the cases of each shipment is proof positive that something was wrong with the refrigerating machines.

The freezing point of asparagus is 29.6°F. Such freezing could not have taken place had the temperature been maintained at 35°.

Moreover, the evidence justifies an inference that, at times, the refrigerated temperature might have been as high as forty degrees. In any event, it was sufficiently high as to have been productive of mold and decay. This would not have developed at less than forty degrees F. The net result was that as the temperature fell below the freezing point, the asparagus was dehydrated and frost was deposited upon the brine coils within the chamber. As the frost deposit thickened, the coils lost some of their efficiency. The temperature rose with resultant condensation and, in one of the shipments, water from melting frost dripped on to the vegetable crates, staining them and saturating some of the asparagus. As the coils became free of ice, the temperature again fell, possibly below the freezing point. Thus it was that alternate freezing and thawing were competent producing causes of the damage that came to this cargo.

In these circumstances, I think the rule announced in Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 196, 79 L.Ed. 373, should be applied. It was there held that if a carrier "delivers a cargo damaged by causes unknown or unexplained, which had been received in good condition, he is subject to the rule applicable to all bailees, that such evidence makes out a prima facie case of liability. It is sufficient, if the carrier fails to show that the damage is from an excepted cause, to cast on him the further burden of showing that the damage is not due to failure properly to stow or care for the cargo during the voyage. * * *

"Similarly, the carrier must bear the entire loss where it appears that the injury to cargo is due either to sea peril or negligent stowage, or both, and he fails to show what damage is attributable to sea peril."

Now, it may be that some of the damage in these cases was due, not to defective refrigeration, but to improper precooling of the asparagus. But, if this be true, the extent to which it is so, is unascertainable, and the burden of showing this rests upon the carrier, and it has not been discharged.

There is substantial proof, too, that the carriage of asparagus from the Argentine is not inherently hazardous. A large fraction of these shipments came through without harm. Libellant has been importing such consignments since 1931, and has received approximately 14,000 crates. In 1933 and 1934, 456 crates, in four shipments, came to him over the Munson Line. One consignment was in poor condition, others were sound. In the same season, 1,174 crates arrived by the Prince Line. All were in good condition. In 1934–1935, out of seven shipments carried by the Munson Line, and totaling 1,121 crates, one lot was in poor condition. Within the same period, the Prince Line safely carried 1,-402 crates. In 1935–1936, out of five Munson Line shipments, containing 1,421 crates, two shipments were in poor condition, and in one of these, 10 crates were frozen, and the balance were good. In that season, also, the Prince Line carried 895 crates, all in sound condition. In 1936–1937, three shipments out of five, transported by the Munson Line, were bad. The Prince Line, that year, carried 690 crates. One lot was bad, 92 crates out of another were frozen, and the balance was in good condition.

Other importers have not fared so well, but the experience of libellant, it seems to me, has been such to demonstrate that the importation of fresh asparagus can successfully be done when proper transportation facilities are provided. They were not provided here, and, in each case, libellant may have a decree.