## THE BUCKEYE STATE.

### No. 2104.

District Court, W. D. New York.
June 10, 1941.

Brown, Ely & Richards, of Buffalo, N. Y., for libellant.

Stanley & Otten, of Buffalo, N. Y., for respondent and claimant.

KNIGHT, District Judge.

On November 27, 1939, at Chicago, Illinois, libellant shipped on board the motorship Buckeye State, owned by Federal Motorship Corporation, respondent-claimant herein, 87,700 bushels of corn, for transportation to Oswego, New York. In transit the cargo was damaged to a very considerable extent either by "heat", as claimed by the libellant, or by "fire", as claimed by the respondents. Libellant herein seeks to recover the amount of such damages.

The vessel was 250 ft. long and 43 ft. 6 inches wide. It had five holds. Holds No. 2 and No. 4, numbering from the forward end, were each 46 ft. in length and the width of the boat. The other holds were smaller. The holds were of different shape than the holds in the ordinary seagoing vessel and were what are known as self-trimmers. The sides extended into the side of the ship at the top at an angle

and the top corners angled off so that the freight would fill up the sides without special trimming. There were common scuttle hatches in the bulk head between holds 1 and 2 and between holds 2 and 3; and also between holds 4 and 5. There is no scuttle hatch between 3 and 4. The cargo holds 2 and 4 were equipped with cargo hold lights with 150 watt electric bulb set in a fixture and over this bulb a vapor globe 5" in diameter and 8" long, and made of glass ¼" thick. In holds 2 and 4 these light fixtures and globes were fitted close up against the under side of the deck some 3 or 4 ft. from the hatch combing. Each of the holds had a light on the port and starboard side and 2 and 4 have two extra lights, one between the forward hatch combing and the forward bulk-head and the other between the after hatch combing and the after bulk-head. These lights were on two separate circuits, one of which carried the lights on the port side and also at the after end of holds 2 and 4 and one of which carried lights on the starboard side and also at the forward end of hatches 2 and 4. Each circuit was on a separate switch, and the switch was located below deck in the engine room.

The loading was commenced at 8 A. M. November 27, 1939, and completed at 3:15 P. M. on the same day. During the loading the grain was tested by a grain superintendent, and it was found to contain 15% moisture content and to be in good order and condition. The grain was also tested by a State Grain Inspector of the State of Illinois, who inspected the boat, found it to be in dry and fit condition, took and examined specimens of the grain. The grain was found by him to contain 15% of moisture, 1.3% of foreign material consisting of "crack corn, * * * anything that is natural substance that comes in the grain." It appears that the limits to foreign material is between 2 and 3%. The inspector testified that in his opinion the cargo was in good order and condition and a certificate showing the result of his inspection was issued. The evidence is conclusive that the grain when loaded was in a good and proper condition.

On November 30, 1939, a strong odor developed in the crews' quarters. The next day the deck between hatches 3 and 4, and 2 and 3 were found to be warm and hot in spots. At about 2 A. M. hoses were played on the deck and 18 or 19 bottles of CO2 gas were forced into the holds. At 8:35 A. M. the ship put in at Port Huron, Michigan, where firemen were called, the hatches opened and water turned into the holds. The hatch covers in holds 2 and 4 when opened disclosed a black charred mass aft and amidship in hold 2 directly beneath the light fixtures, and disclosed comparably the same condition forward amidship in hold 4 directly beneath the electric light fixtures. In this charred mass in hold 2 a partially melted and broken vapor globe was found, and the vapor globe amidship forward in hold 4 was found to be broken. Parts of these vapor globes were delivered to the Master of the vessel by the firemen. They were not produced upon the trial. The uncontradicted evidence discloses that the vapor lights amidship in holds 2 and 4 were smothered in the grain when loaded. The uncontradicted evidence is that the cargo lights were left turned on some hours following the loading, and the fair conclusion drawn from all the evidence is that they were left turned on an indefinite time thereafter. The light switches were in control of the men on deck and were accessible to any member of the crew. The evidence establishes beyond peradventure of doubt that the origin of the damage was from the electric lights.

A contention made by the libellant is that respondents must respond whether "heat" or "fire" was the cause of the damage. Under the Fire Statute, 46 U.S.C.A. § 182, R.Stat. § 4284, the owner of the vessel and the vessel are exempt from liability for damage "unless such fire is caused by the design or neglect of such owner." Design means with intent. There is nothing here to show design. " 'Neglect of such owner,' means personal negligence of the owner, or, in case of a corporate owner, negligence of its managing officers or agents." Earle & Stoddart v. Wilson Line, 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403. Negligence "of what in other connections is held to be a nondelegable duty" does not take away the exemption in this statute. Earle & Stoddart v. Wilson Line, supra. There is nothing here to show "neglect" within such definition.

While it is quite clear that there was a negligence on the part of the crew in loading the grain, it is immaterial whether fire, if any, was caused through such negligence, and it is immaterial whether the vessel was unseaworthy.

The further claim is made by the libellant that where there is fire damage the

Fire Statute, supra, leaves the owner liable to the value of the vessel, and it cites the Etna Maru, 5 Cir., 33 F.2d 232, 233, certiorari denied 280 U.S. 603, 50 S.Ct. 85, 74 L.Ed. 648. No implication is to be drawn from the denial of certiorari that the Supreme Court indicates any expression upon the merits. Atlantic Coast Line R. Co. v. Powe, 283 U.S. 401, 51 S.Ct. 498, 75 L.Ed. 1142. The decision in Etna Maru, supra, seems to be against the weight of the authorities and not in accord with the plain meaning of the statute. The Rapid Transit, D.C., 52 F. 320; The President Wilson, D.C., 5 F.Supp. 684; Keene v. The Whistler, Fed.Cas.No.7645; Dill v. The Bertram, Fed.Cas.No.3910. In a footnote in Earle & Stoddart v. Wilson Line, supra, reference is found to Etna Maru, supra, and the Rapid Transit, supra. The indication there seems to be that the Etna Maru decision was disapproved.

■ It is also claimed by the libellant that under the Harter Act the respondents are not relieved from liability. It does not appear to me that the Harter Act, 46 U.S.C.A. § 190 et seq., has any application. This is not a Harter Act case. The Supreme Court in Earle & Stoddart v. Wilson Line, supra, clearly points out the right to exemption where the damage is caused by fire, except where "caused by the design or neglect" of the owner.

None of the above contentions can be sustained. The sole question for determination here is whether "fire" or "heat" caused the damages; if caused by "fire", libellant cannot recover; if by "heat", the libellant is entitled to recover.

■ Finding that the cargo when loaded was in good condition and order and, as admitted, that damage to the cargo was done in transit, the burden is placed upon the respondents to establish by a fair preponderance of the evidence that the damage was occasioned by a cause for which they were not liable. Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373; Spencer Kellogg & Sons v. Great Lakes Transit Corp., D.C., 32 F.Supp. 520; Standard Brands v. Boston & Maine R. R., D.C., 29 F.Supp. 593; Cox v. Farley, D.C., 34 F.Supp. 446.

■ "Fire" is caused by ignition or combustion, and it includes the idea of visible heat or light. "No definition of fire can be found that does not include the idea of visible heat or light, and this is also the popular meaning given to the word. * *

the internal development of heat never at any time became so rapid as to produce a flame or a glow, and hence, * * * there was no fire." Western Woolen Mill Co. v. Northern Assurance Co. of London, 8 Cir., 139 F. 637, 639, certiorari denied 199 U.S. 608, 26 S.Ct. 750, 50 L.Ed. 331. Clearly damage may be done by "heat" alone without "fire". These cases point the distinction between "fire" and "heat" as a cause of damage: Austin v. Drewe, VI Tauton's Reports 436; Briggs v. Insurance Co., 53 N.Y. 446; Babcock v. Insurance Co., 4 N.Y. 326; Mitchell v. Insurance Co., 183 U.S. 42, 22 S.Ct. 22, 46 L.Ed. 74, et al. Both the libellant and the respondents produced on the trial samples of the damaged corn. All look alike. These furnish no aid in deciding the cause of the damage. None of these showed any ash.

Respondent takes the position that the damage was not caused by any "electric light," but "by something burning in the hold and generating a large volume of heat," and that the fire in the grain was "caused by a condition inherent in the cargo or by foreign substance in the cargo." There is nothing in the record to show that there was any condition "inherent in the cargo" which could cause a fire. As stated, the proof that the cargo was in a good and proper condition is uncontradicted. There is nothing in the record to show the presence of any foreign substance in the cargo, save the testimony of a surveyor, presented by the respondents, who stated that he found a piece of oakum in hold 2 and also one in hold 4, and further, his statement that another piece of oakum was shown him as found in hold 3 by a representative of both parties. The testimony of this surveyor is directly contradicted by that individual. Nothing is said about the presence of oakum by the numerous other individuals who had access to these holds after the grain had been damaged. None of these testified to seeing or finding any foreign substance. Several pieces of oakum a few inches in length were produced as those found. Had fire in these two holds been caused by foreign material of this character, it seems obvious that there would have been other evidence of the presence of this material. In view of other circumstances proved to the court's satisfaction, no credence is given to this testimony.

It is urged that "fire" may have been caused by sabotage. Possibly it was, but there is no evidence here of this. Taking

the position that the damage was not caused by any electric light, respondents are, therefore, left with substantially no proof of "fire", save evidence offered as to the extent the corn was burned in hold 2 and hold 4 and the condition of the damaged corn and the vapor globes, the rapidity with which the damage was done, and that when the holds were opened smoke was seen to be issuing from the hatches. There is no evidence that any one at any time saw any blaze or flame in connection with this damaged cargo. The damage done to the cargo in holds 1, 3 and 5 evidently was caused by smoke or gas pouring through the scuttle hatches from 2 and 4. No charred or burned corn was found in holds 1, 3 or 5. There is evidence that the paint on the bulkhead of holds 2 and 4 and under some parts of the deck, back of the combing, in hold 4 was burned to some extent. The Master testified that he found the paint burned off over a considerable space in hold 2 and around the cargo lights in hold 2 and 4. While there is other evidence that the paint was burned around the vapor lights, the testimony of the Master as to the extent of so-called burning at these points finds support only in the testimony of respondents' surveyor. None of the other various witnesses described comparable conditions.

The libellant produced a chemist of long experience who testified that in his opinion the damage to the cargo was done by "heat" and not by "fire." He based his opinion upon the fact that the samples showed no ash and the conditions under which this cargo was carried. Ash is indicated as a grayish white substance. He pointed out that fire is combustion with the presence of flame or glow; that the constituents of corn are sugar, fats, dextrin and proteins; that when heat is applied the corn first goes through a drying condition, the moisture being removed around 212° F.; that then with increased heat comes decomposition of the constituents resulting in a blackened mass principally composed of carbon; that this carbon will only ignite at a temperature of 1400° F. or higher, and there will be no visible flame or glow at lower than 1400° F., and that in the decomposition process ash would not show; that corn will char as shown in the sample here when exposed to "heat" without "fire" or flame; and that it is not possible that this corn in the cargo reached 1400° F. This witness stated that the results of his experiments with heated corn showed that

corn when smothered and heated by an electric bulb to a temperature of 800° F. began to smoke in half an hour, charred in about an hour but showed no ash; no visible flame or glow; and threw off a yellowish white gas or smoke with an odor. This witness also gave his opinion that the condition of one of the vapor globes resulted by deformation by "heat" and not by "fire" and gave his opinion that this condition could be accounted for by application of heat below the point where there was "fire." This globe was not produced in evidence.

The libellant also produced another witness who made several experiments directed to show the effect of heat from an electric light smothered in corn. Certain of these experiments as described by him resulted in producing charred masses of corn comparable to the samples of the cargo.

Tests were made by this witness by placing a 150 watt bulb, without any vapor globe, in a metal drum in two or three bushels of corn. In approximately 24 hours the bulb broke but there was no fire. Another test was made with a 150 watt bulb in a 5″ vapor globe smothered in corn and the test continued for 96 hours. The grain became charred and black, some smoke was given off, but there was no visible flame or glow. Samples of this test are indistinguishable from the samples taken from the cargo. Other tests of the action of heat without flame when applied to corn were shown. Corroboration of some of these tests is made by a disinterested witness.

█ Libellant has also offered evidence as to the condition of the cargo when found to have been damaged. As regards many of the physical facts there is little dispute. The evidence submitted by the libellant, in the view of the court, is sufficient to sustain the claim here that this damage was caused by heat as distinguished from "fire with glow or flame." These large holds 2 and 4 were filled almost to their extreme capacity. The lights and globes amidship in these holds were buried within two or three inches of the points on the deck where they were attached, the entire fixtures being almost entirely smothered by the corn. This cargo had been fully loaded for nearly four days before the hatches were opened. Aside from other factors, it is to be remembered that there could have been very little oxygen in the holds to support combustion. The lights

caused the origin of this damage. It is believed the damage was caused by "heat" and without "fire." The libellant is entitled to recover the damages sustained to the cargo in question.

The cargo was delivered at Buffalo rather than Oswego. This was done upon the recommendation of the surveyors to minimize the loss. Any question relative to the effect of this delivery in the amount of liability is a matter to be passed upon in the first instance by the Commissioner.

An order of reference will be made to a Commissioner to be appointed by this court to report the amount of damage after hearing evidence thereon.