CARGO CARRIERS, Inc., v. BROWN
S. S. CO. et al.

THE JAMES E. McALPINE.

No. 2201.

United States District Court
W. D. New York.

Aug. 9, 1950.

Sanders, Hamiton, Dobmeier & Connelly, of Buffalo, N. Y., and Atkins & Weymar, of New York City (William M. Connelly, of Buffalo, N. Y., and Horace T. Atkins, of New York City, of counsel), for libellant.

Richards & Coffey, of Buffalo, N. Y. (Lawrence E. Coffey and James P. Heffernan, of Buffalo, N. Y., of counsel), for respondents.

KNIGHT, Chief Judge.

Libellant alleges it is a Delaware Corporation and that the respondent is a corporation and a common carrier of merchandise by water between ports of Duluth/Superior and Buffalo and controlled the steamship James E. McAlpine; that on June 14, 1948, it delivered to and respondent received in good condition 277,000 bushels of No. 3 yellow corn; that respondent loaded same on said steamship and undertook to transport it to port of Buffalo, N. Y., and there deliver it to libellant in same good condition as when shipped; that said steamship, on June 18, 1948, arrived at Buffalo, where cargo was discharged and delivered and a part thereof "was delivered heated, charred and damaged by contact with smoke and/or contact with other deleterious substances, all by reason of the unseaworthiness of the said steamship * * * and/or by reason of the lack of care exercised by respondent or by its servants or by those in charge of the steamship * *

with respect to the care and custody of said shipment"; that libellant owner thereof has performed all conditions of contract of carriage and has sustained $20,000 damages.

The answer, besides general denials, has four separate defenses, to wit (1) that alleged damage "resulted from fire which occurred without the actual fault or privity of the respondent"; (2) that a bill of lading was issued and the alleged damage resulted from fire without actual fault or privity of respondent; (3) that alleged damage "arose from inherent defect, quality or vice of said corn"; (4) that it resulted "from an act, neglect or default of the master or servants of the respondent in the navigation or management of said Steamship."

The bill of lading is entitled "American Form 1936 Lake Grain Bill of Lading" and is dated June 14, 1948. It recites:

"Shipped in apparent good order and condition by Cargo Carriers, Inc. as agents and forwarders * * * on board the Str. McAlpine * * * now in the port of Duluth/Superior and bound for Buffalo, New York the following property as herein described (277,000 Gross Bushels 3 Yellow Corn) * * *. It is understood and agreed with respect to this shipment the carrier and ship have not and do not hold themselves out as transporting cargo for the general public and only transport cargo as private carrier under private contract. The liability, which the carrier assumes with respect to this shipment, is subject to the following terms and conditions:

"1. This shipment is and shall be subject to the terms and provisions of and all the exemptions from liability contained in the Act of Congress approved April 16, 1936, and known as the 'Carriage of Goods by Sea Act' * * *."

Libellant chartered the full capacity of this steel bulk carrier, which is 432 feet long, 58 feet wide and 28 feet deep. The cargo space is about 300 feet long, divided into 4 compartments, each containing 6 hatches, and having a total carrying capacity of 285,000 bushels of corn. Each hatch is lighted by 2 electric 100-watt lights protected by a vapor globe about 10 inches long.

The steamship reported at Superior, Wisconsin, on June 14, 1948, with a cargo of soft coal, which was unloaded. Her cargo holds were then swept and she was visited by an inspector who approved her for loading the corn, which began at 1:50 P.M. Compartment 1 was first about half filled with corn, then compartments 2, 3 and 4 were filled. The loading of compartment 4 was completed about midnight and her hatches were battened down. The vessel left her dock on June 15, 1948, at 1:50 A. M., and arrived at the port of Buffalo in the evening of June 18, 1948.

The hatch lights were not turned off until 3 A.M. of June 15, 1948. About 10 A.M. of that day, there was an odor and some mist or haze in the dunnage room just forward of the forward cargo compartment. It disappeared after the forward scuttle hatch was opened. At night there was an odor in the fire hold just aft of the after cargo compartment. It too disappeared when a scuttle hatch was opened. On June 17, 1948, when the ship had reached Lake Huron, the odor became intenser and smoke was seen rising from some of the hatches. During the night the deck on starboard side above hatch 22 was warm.

The hatches were opened at Buffalo shortly after 8 A.M. on June 19, 1948. Discharge of the corn began a half hour later. After about 10,000 bushels had been removed from hatch 22, a core of charred, darkened corn appeared on the starboard side under the electric light. This core extended about 10½ feet from under the light to the main deck shelf and 3 or 4 feet deeper. Top of core was loose and easily dislodged but near the shelf it was so solid that it had to be dislodged with pickaxes.

When the core was exposed, burning embers were noticed which soon burst into a flash flame, extinguished with a fire extinguisher. Later in the morning, as the unloading proceeded, the smoke became so dense the grain shovelers quit work and water from the ship's hose was sprinkled on the core. Notwithstanding this, flames again burst out and were extinguished.

After unloading was suspended in the evening, a watchman stationed on deck twice saw glowing embers and smoke and used the ship's hose to prevent fire.

Section 182 of 46 U.S.C.A. in effect at time of this loss, provided: "No owner of any vessel shall be liable to answer for or make good to any person any loss or damage, which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner."

Section 188 thereof made this non-liability apply "to all vessels used on lakes or rivers or in inland navigation, including canal boats, barges, and lighters."

The term "fire" is not defined in the statute.

In The Buckeye State, D.C., 39 F.Supp. 344, in part similar to the case at bar, this Court said: " 'Fire' is caused by ignition or combustion, and it includes the idea of visible heat or light. 'No definition of fire can be found that does not include the idea of visible heat or light, and this is also the popular meaning given to the word. * * * the internal development of heat never at any time became so rapid as to produce a flame or a glow, and hence, * * * there was no fire.' Western Woolen Mill Co. v. Northern Assurance Co. of London, 8 Cir., 139 F. 637, 639, certiorari denied 199 U.S. 608, 26 S.Ct. 750, 50 L.Ed. 331. * * *." 39 F.Supp. at page 347.

In the instant case chemist Hall testified: "Oxygen is necessary for combustion. It is the reaction of oxygen with carbon, hydrogen, nitrogen, phosphorus, and so forth, which we see as combustion. That is reaction. When it reaches the point where it glows or it is a flame, then we call it fire."

No flame was seen at any time until after part of the core in hatch 22 had been uncovered and exposed to the air. The ship's master and others on the boat who perceived the odor, haze and smoke did not suspect any fire in the cargo. Witness Butler, dangerous cargo engineer, testified:

"My opinion is there was no fire on that cargo between Superior and Buffalo until after they started unloading." The master testified:

"Q. Did you observe any burnt grain when it was running into the hold? A. No.

"Q. Then the damage, whatever it was, occurred in transit, is that correct? A. Yes.

"Q. * * * There is such a thing as heat where there isn't fire? A. Yes.

"Q. I mean corn can become heated? A. Yes, I believe so.

"Q. And not be on fire? A. That is right.

"Q. Now, when the hatches were open in Buffalo * * * and you observed No. 22 hatch, you saw no fire at the time that the hatch was opened? A. No."

The smoke damage was not caused by fire but by a change in the kernels of the core which chemist Hall called "a distillation process." This resulted from heat.

Dangerous cargo engineer Butler said:

"The initial heat evolved by a burning electric bulb in a vapor globe such as you have shown me, would be sufficient to initiate the self heating of corn when the corn was aboard the ship in the manner in which it was in the 'McAlpine'.

"Q. What would be the effect after the light had been turned off? Would the effect cease? A. Under some conditions it may cease, but it is my opinion that the temperatures generated by that bulb * * * if the light was kept burning for half an hour it would initiate enough heat to cause the self heating of the corn and continue even after the bulb was turned off any time after 30 minutes.

"Q. You are assuming the application of this heat is on the surface of the corn? A. I am assuming it is in contact with the corn.

"Q. At the top of the pile? A. Yes.

"Q. Would there be an odor, smoke or what? A. Once the process was started and the heat of the lamp in my opinion is enough to start the self-heating process it would continue of its own volition * * *

with an increase in temperature and that decomposition of the corn and the odors that would follow are certain to be present * * *. It is a characteristic of corn when it has started to heat that the process will continue with intensity as the heating proceeds. It also has a tendency to seek the center * * * or the more dense section of the pile * * *."

Chemist Hall for libellant testified at length to an experiment he performed with the same kind of light submerged in a pail of corn. He concluded: "The lamp could very well initiate the action and the re-action at the hard part would then proceed to expand as it progressed and the fact that it does expand and cover a large terri-tory could indicate that the only direction it could go would be downward, and this cone was larger at the base than at the top, which means it was going down and spreading, and the reaction was covering more at a longer time at the bottom * * *. The reaction at the bulb com-menced. Heat makes the reaction go fast-er and as you progress from there you cover a larger territory. It keeps spread-ing. So to me the reaction started at the top and worked down. If it had started at the bottom we would have a larger cone, a larger surface at the top."

Witness Hall further said: "A smoke odor came from the reaction aboard the boat at the time the cone was being formed before unloading.

"Q. Would you say whether or not fire was a factor? A. Fire was not a factor."

There were 2 electric lights in each of the 24 hatches, one on the port and one on the starboard side. All the lights on the port side were 5 inches lower than on the starboard side. The core in question was found under the starboard light of hatch 22, two hatches from the ship's stern. There was no damage to the corn other than in hatch 22.

Duberney, respondents' second assistant engineer, testified: "I turned them (the lights) all off at 3 o'clock in the morning. * * *.

"Q. Do you remember in what particu-lar hatch most of the difficulty appeared to be? A. 22 hatch * * *.

"Q. In what position was that cargo hold light in No. 22 hatch? * * * A. Starboard side * * *. It is horizontal and comes out from under the deck. It is about three feet from the hatch opening and about twenty inches below the deck."

Evidence that the light on starboard side of hatch 22 had been submerged in the corn is also found in the testimony of respond-ents' witness Smith, who said: "The light had been submerged in the corn because kernels of corn adhering to the globe. How deep, I don't know."

The third mate said he noticed that the cargo was "a very dusty load—a dirty load we call it." The first mate testified that he noticed that cargo was "an extremely dusty cargo."

These men claimed they noticed this when cargo was being loaded, but there is no evidence that any report was ever made by them to any of the officials of the vessel.

The ignition point of corn is 1500 degrees F. witness Hall made several tests to deter-mine the degree of temperature at which decomposition of corn will appear. In his No. 1 test with a vapor globe, such as re-spondent used, after submergence of the globe in the corn, decomposition appeared to set in at 274 degrees F. and the corn then threw off some odor and a slight mist was apparent. After submergence of the globe in the corn for one hour, some-what greater decomposition, some change in color, some odor and with some fluid being formed on the corn showed at 336 degrees F. Odor and misty appearance were no-ticed. In an hour and a half test with the heat at 400 degrees F. further decomposi-tion was noted. In none of the experiments made by Hall did the temperature exceed 596 degrees and this temperature was reached after three hours submergence.

There seems no question there was com-bustion. The fact that kernels of corn were found adhering to the vapor globe, which was in hatch 22, proves positively that the corn was in contact with the heat. Only ten hours after hold 4 had been loaded, an odor and mist were noticed in the dunnage room 250 feet distant from hatch 22. Had the heating started deep down in the hatch, or near the deck shelf, it would

292

have been less likely that the odor or mist would have penetrated into the distant dunnage room. More probably these came from the top of corn and through the bulkheads along the steam pipes to the dunnage room. It is not believed that combustion could have been caused by any foreign matter in the corn at the time of loading. Ten hours would seem too short a time in which to bring about the conditions first shown. It is clear that heat caused by combustion may progress upward or downward as the conditions around it differ. As pointed out by the witness Hall, "the heat may start at a point and it would develop away from that, covering the path of least resistance".

In Western Woolen Mill Co. v. Northern Assurance Co., supra, it was said: "Fire is always caused by combustion, but combustion does not always cause fire. The word 'spontaneous' refers to the origin of the combustion. It means the internal development of heat without the action of an external agent". [139 F. 637, 639.] No flame was disclosed until the cone was opened up.

■ The instant case differs in some material respects from The Buckeye State, supra, decided by this Court. It is true that the vapor globe in The Buckeye State had been in the corn a considerably longer time before there was evidence of combustion. There it was conclusively shown that the grain when loaded was in good condition. Each case must be decided upon its facts. The facts in this case support the decision that "combustion without fire" originated from the contact of the vapor globe with the corn in hatch No. 22.

The McAlpine is a large vessel. It had been swept immediately prior to the loading of the grain. Since the ship's prior load had been coal, it might well be reasoned that some of the sweepings had gotten into hatch 22 and in conjunction with the "heat" from the vapor globe caused the combustion, but in any event it seems to this Court that the heat from the vapor globe was the proximate cause of the damage to the grain.

■ The rule of law is well established that when it appears the cargo was in good condition when loaded, the responsibility rests upon the ship owner to establish by a fair preponderance of the evidence that any damage was caused by another. Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373; Great Atlantic & Pacific v. Lloyd Brasileiro, 2 Cir., 159 F.2d 661–663; The Monte Iciar, 3 Cir., 167 F.2d 334–337.

It is not disputed that the damage to cargo resulted during transportation. The fact that over 200,000 of this cargo of 277,000 bushels was found to be in good condition is some evidence that the entire cargo was in good condition when loaded. Rich v. Lambert, 12 How. 347, 53 U.S. 347–356, 13 L.Ed. 1017, and cases cited. See also The Pocone, (Petition of Republic of U. S. of Brazil), D.C., 91 F.Supp. 961, 963, reported in 1950 A.M.C. on page 992, where the Court said in part: "The Commissioner, like any finder of the facts, is entitled to make inferences, and the evidence here before him that a substantial proportion of the salvaged merchandise was in sound condition at outturn is surely good ground for finding that the ruined merchandise was equally sound, at least in the absence of countervailing proof."

As was said by Mr. Justice Stone, in the Schnell case: "He (the ship owner) is a bailee intrusted with the shipper's goods, with respect to the care and safe delivery of which the law imposes upon him an extraordinary duty". [55 S.Ct. 196.]

Further the Carriage of Goods by Sea Act, Sec. 3(4), 46 U.S.C.A. § 1303(4), provides that the covering bill of lading shall be prima facie evidence of receipt by the carrier as described in the bill of lading and as heretofore pointed out the bill of lading in the instant case recites that the cargo was "shipped in apparent good order and condition".

■ "The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport". The Silvia, 171 U.S. 462, 19 S.Ct. 7, 8, 43 L.Ed. 241. The McAlpine was

"unseaworthy" by reason of the fact that this vapor globe was submerged in the corn and the heat from it created a condition of combustion and this condition should reasonably have been anticipated.

Libellant is entitled to recover the damages sustained to the cargo of corn. Unless stipulated, a commissioner will be appointed to take proof of the amount of such damages.