452 P.2d 539

**HARTFORD FIRE INSURANCE COMPA-NY; the American Insurance Company; and Merchants Fire Assurance Corporation of New York, Appellants,**

v.

**ELECTRICAL DISTRICT NO. 4 OF PINAL COUNTY, Arizona, Appellee.**

**No. 2 CA–CIV 597.**

Court of Appeals of Arizona.

March 25, 1969.

Rehearing Denied April 15, 1969.

Review Denied May 6, 1969.

Moore, Romley, Kaplan, Robbins & Green, by Craig R. Kepner, Phoenix, for appellants.

Rawlins, Ellis, Burrus & Kiewit, by Norman D. Hall, Jr., and R. J. Ellis, Phoenix, for appellee.

MOLLOY, Chief Judge.

In this case, we must determine whether the evidence presented justified a jury verdict in favor of the plaintiff-appellee's claim that damage to its electrical transformer was caused by "fire" within the

meaning and coverage of the standard fire insurance policies issued by appellants.

The plaintiff-appellee, Electrical District, owns and operates the Empire substation near the City of Eloy. The basic functioning mechanism of the substation is a transformer, which reduces or "steps down" the 115,000 volt current in the nearby Bureau of Reclamation transmission line to a 12,000 volt current suitable for distribution. A transformer such as the one here involved consists of three sets of three basic elements, which are a core, a secondary winding, and a primary winding. The core, in the center, is made of laminated steel. It is surrounded by the secondary or lower voltage winding, which is essentially a coil of copper wire. The secondary winding is in turn surrounded by the primary or higher voltage winding, which is a larger and more extensive coil of copper wire. The turns or coils of copper wire which make up both sets of windings are wrapped in a paper-like insulating material made of wood pulp. In addition, the three basic elements are separated from each other by thicker, pressboard-like insulation, which is also made of wood pulp. All of the elements and insulation are immersed in a "bath" of oil and are enclosed within a steel tank. One of the functions of the oil is to help insulate the component elements of the transformer.

On November 3, 1964, a coatimundi[1] crawled onto a part of the substation apparatus, on the low voltage side, causing a short circuit. Due to the failure of certain protective devices to function, this short circuit caused many times the rated capacity to flow through the transformer for approximately six minutes. This excessive flow caused the copper wire in the two sets of windings to overheat, The overheating of the copper became such that the paper insulation "burned," or "failed," which was followed by additional short circuiting within the transformer, further overheating and eventually melting of the copper wiring and causing electrical arcing to the core. The entire transformer was badly damaged, necessitating rebuilding and repairs to the extent of $50,335.40.

Each of the similar policies issued by appellants insure the Electrical District " * * against all DIRECT LOSS BY FIRE * * * " The policies contain a number of qualifying and exclusionary clauses, including an "Electrical Apparatus Clause":

> "IF ELECTRICAL APPLIANCES OR DEVICES (INCLUDING WIRING) ARE COVERED UNDER THIS POLICY, THIS COMPANY *SHALL NOT BE LIABLE FOR ANY ELECTRICAL INJURY OR DISTURBANCE TO THE SAID ELECTRICAL APPLIANCES* OR DEVICES (INCLUDING WIRING) *CAUSED BY ELECTRICAL CURRENTS* ARTIFICIALLY GENERATED *UNLESS FIRE ENSUES*, AND IF FIRE DOES ENSUE THIS COMPANY SHALL BE LIABLE ONLY FOR ITS PROPORTION OF LOSS *CAUSED BY SUCH ENSUING FIRE*." (Emphasis added) [2]

■ Neither the word "fire" nor the term "ensuing fire" is defined in the policy.[3] In the absence of a policy definition, the courts have generally held that the

1. A small mammal, most closely related to a raccoon, which is indigenous to Mexico and has emigrated to some extent into our southwestern states.

2. All parties to this appeal have assumed that this language served to limit coverage. We leave this assumption as we find it, not considering it critical to the outcome. We believe it to be at least arguable that this language could serve to extend, but not limit, coverage in that it is not a part of the New York Standard Fire Policy adopted in this state. *See* A.R.S. § 20–1503, and Scottish Union & Nat. Ins. Co. v. Phoenix Title & Trust Co., 28 Ariz. 22, 235 P. 137 (1925).

3. In Niagara Mohawk Power Corp. v. Aetna Insurance Co., 15 App.Div.2d 390, 224 N.Y.S.2d 536, 538 (1962), the policy in question defined the term "ensuing fire" as a " * * * self-sustaining fire which continues after electrical currents have been interrupted * * * " Witnesses "observed fire" in the two generators in question in the *Niagara Mohawk* case.

word "fire" is to be understood in ordinary and popular lay, rather than technical and scientific, terms. Thus, in the words of one court:

> "The word 'fire,' in insurance, does not have the technical meaning which is developed from a scientific analysis of its nature and properties, but more nearly that which conforms to the popular understanding of the word."

Lavitt v. Hartford County Mut. Fire Ins. Co., 105 Conn. 729, 136 A. 572, 574 (1927).

■ Such a construction of the word is in accord with the Arizona rule that undefined words in an insurance policy will be defined " * * * in the common sense terms of the average layman * * *," rather than in technical terms. Malanga v. Royal Indemnity Company, 101 Ariz. 588, 591, 422 P.2d 704, 707 (1967); and see also Dairyland Mutual Insurance Company v. Andersen, 102 Ariz. 515, 517, 433 P.2d 963, 965 (1967).

The plaintiff's theory below, and here, is that there was a "fire" when the paper insulation in this transformer charred from the heat, carbonized, and became a conductor rather than an insulator. Without such breaking down of the insulation, the plaintiff contends there would have been no appreciable damage to this transformer.

■ It is our view that the undisputed evidence does not support this theory. All testimony is to the effect that all of this "burned" insulation was "bathed" and "wet" with oil at the time it was injured. When the oil in which it was immersed became overheated on this occasion, it expanded and came out an escape vent in the top of the steel tank in which these elements were contained. Though this oil poured forth on the ground around the transformer, it did not ignite. Though there was testimony that this insulation "glowed" along with the wire contiguous to it, there is no evidence of a probability that there were flames in connection with this damage. There is testimony in the record, which stands undisputed, that as this insulation was carbonizing, it was absorbing heat rather than giving off heat.[4]

There were three[5] electrical engineers who testified as to the cause of this damage. Their testimony is substantially without controversy. We believe the following excerpts from the transcript fairly summarize their opinions on the basic cause of the damage:

> "MR. KEPNER: Let me ask you this final question, Mr. Locher: As far as the ultimate damage that was done in this transformer it was caused by the excessive electrical current flowing through it? Just yes or no if you can answer that?
>
> "A Well, this triggered the whole set of events, yes.
>
> "Q That is what caused this damage to the transformer, did it not?
>
> "A Well, yes."[6]
>
> * * * * * *
>
> "MR. KEPNER: Going back to your very original statement on the matter it would be fair to say that this entire damage was caused by the excessive heat developed from this excessive electrical

---

4. The following are excerpts from testimony of Dean Moody, a consulting electrical engineer:

   "Q Now, at the time that this insulation was being destroyed was it giving off heat or was it absorbing heat?

   "A It was trying to absorb heat.

   "Q So that the process that was going on inside the insulation, if I could use that term, which is probably a little loose, was one whereby heat was being absorbed rather than given off.

   "A Yes."

5. A fourth electrical engineer, Gordon David Jorgensen, was called to the stand by the defendant, as an adverse witness (Mr. Jorgensen was a member of the firm employed by the plaintiff as consulting engineers). Both parties abstained from asking this witness to give his opinion as to the cause of this damage.

6. From cross-examination of Ronald J. Locher, a consulting electrical engineer called by plaintiff.

current flowing through the transformer?

"A. That's right." [7]

\* \* \* \* \* \*

"Q. Mr. Moody, based on your experience as an electrical engineer can you think of a more typical classic example of damage caused by excessive artificially generated electrical current?

"A. This would be as typical as any one." [8]

■ One of the experts opined that there was "combustion" within this tank, but he never explained his answer.[9] One testified that there " \* \* \* could have been a momentary flame." [10] But these conjectures must give way to the undisputed physical facts. "Combustion" is not equivalent to a layman's concept of "fire." *See* Western Woolen Mill Co. v. Northern Assur. Co., 139 F. 637, 639, 72 CCA 1 (8th Cir. 1905), *cert. denied,* 199 U.S. 608, 26 S.Ct. 750, 50 L.Ed. 331 (1905). And what "could have been" is not sufficient to satisfy a plaintiff's burden of proof. *See, e. g.,* Ager v. Baltimore Transit Company, 213 Md. 414, 132 A.2d 469, 472–473 (1957), and compare Southwestern F. Lines, Ltd. v. Floyd, 58 Ariz. 249, 264–265, 119 P.2d 120, 127 (1941). In our view, a process which neither creates substantial amounts of heat nor has flame is not "fire."

■ Every definition of "fire" that we have found includes the idea of heat, and it seems inherent that the alleged fire should itself create heat. There is also a sharp distinction to be drawn between damage caused by fire and damage caused by mere heat without fire. The distinction is clearly shown in The Buckeye State, 39 F. Supp. 344 (W.D.N.Y.1941). In that case, a cargo of corn was burned or charred in the hold of a ship. The policy in question covered damage by heat but not by fire. The evidence established that the origin of the damage was from electric lights. 39 F. Supp. at 346. The court noted that "Clearly damage may be done by 'heat' alone without 'fire'," *Id.* at 347, and held that heat, not fire, was responsible for damage to the corn.

No judicial decision has come to our attention which would classify what happened here as "fire." Of the many cases cited, we comment on three that seem the closest in factual orientation. In Saul J. Baron Corporation v. Piedmont Fire Ins. Co., 166 Misc. 69, 1 N.Y.S.2d 713 (1937), the court held that the mere charring or burning of electrical wiring resulting from an overload of electrical current was insufficient to show fire damage. We distinguish Sachs v. American Central Insurance Company, 33 Misc.2d 816, 227 N.Y.S.2d 873 (1962), additional opinion, 34 Misc.2d 687, 230 N.Y.S.2d 126 (S.Ct.1962), where an eyewitness testified to the presence of flames, and the court found that a fire had occurred. In Jorgensen v. Hartford Fire

---

7. From cross-examination of John Fenwick, an electrical engineer employed by Westinghouse Electric, the firm that rebuilt this transformer, called to the stand by the plaintiff.

8. From direct examination of Dean Moody, a consulting electrical engineer called to the stand by the defendant.

9. Although Fenwick stated that " \* \* \* one of the accepted definitions of combustion is \* \* \* the union of substances with oxygen and accompanied by light and heat," there was no explanation as to the source of oxygen to combine with this insulation in a process of oxidation. He admitted that there was no free oxygen in the transformer, since its components were under oil, but stated that there was oxygen present in the "materials," presumably the wood pulp. There was no testimony, however, that the insulation would burn up of its own rearrangement of its chemical content, as there was in H. Schumacher Oil Works v. Hartford Fire Ins. Co., 239 F.2d 836, 839 (5th Cir. 1956). In the absence of other description, the "oil" referred to would presumably be petroleum, which is a mixture of hydrocarbons, composed solely of hydrogen and carbon, plus minor impurities.

10. Locher, at 121 of R.T.

Insurance Company, 13 Utah 2d 303, 373 P.2d 580 (1962), there was testimony by an electrician that there would have been a flame in or about a motor after a bearing had burned out. Referring to that testimony as "* * * most important * *," the court sustained a finding that there had been at least "* * * some 'fire.'" 373 P.2d at 581–582. A judgment for the insured was reversed, however, and the cause remanded for a determination of whatever damage there may have been as a result of the fire itself, as opposed to the extensive damage caused by the burning out of the bearing.

Judgment reversed with instructions to enter judgment for the defendant.

HATHAWAY and KRUCKER, JJ., concur.