# FRED H. MORK AND ANOTHER v. EUREKA-SECURITY FIRE & MARINE INSURANCE COMPANY.[1]

March 17, 1950.

No. 35,074.

*Bundlie, Kelley, Finley & Maun* and *Walter N. Trenerry,* for appellant.

*Walter T. Ryan* and *Alfred R. Sundberg,* for respondents.

MAGNEY, JUSTICE.

In an action on a fire insurance policy, defendant moved to set aside a jury's answer to a special interrogatory, to set aside and vacate certain findings of fact and conclusions of law and to substitute others proposed, or for a new trial. From the order denying its motion, defendant appealed.

Plaintiffs are the owners of a residence property in St. Paul. A fire insurance policy issued on the dwelling by defendant contained an endorsement known as "Extended Coverage Endorsement" in the following language: "* * * the coverage of this policy is extended to include direct loss or damage by * * * explosion." The policy also permitted unoccupancy of the building for a period of six months and defined an unoccupied building as one "entirely furnished, but with personal habitants temporarily absent."

During the latter part of December 1946 plaintiffs were temporarily absent from their house. From December 27 to December 31, 1946, no one visited or occupied the premises. During that period, the temperature ranged from 29 degrees above zero on December 27 to 21 degrees below zero on December 31. The house was heated by an oil-burning hot-water system. On December 31, it was discovered that an explosion had taken place within the fire chamber of the furnace. The door of the furnace had been blown open and the fire had been put out. The cause of the explosion was explained by men in the heating business. They said that a leak in the hot-water coil in the furnace had permitted water to come in contact with the hot firebrick which lined the inside of the furnace, thus creating enough steam to cause an explosion and throw open the furnace door. The escaping water caused a short in the electrodes, which put the oil burner out of operation. As a result, the water in every

radiator in the house was frozen and the radiators damaged, as was also certain plumbing.

A board of arbitrators, selected as provided by statute and the contract of insurance, found the loss to be $1,137.25. They also found, apparently, that the loss was not covered by the policy. The latter finding was not within their province and mere surplusage. The finding of appraisers on the question of coverage, which would be a decision on a question of law, would not be final. Itasca Paper Co. v. Niagara F. Ins. Co. 175 Minn. 73, 220 N. W. 425; Ciresi v. Globe & Rutgers F. Ins. Co. 187 Minn. 145, 244 N. W. 688. In their complaint plaintiffs alleged that the purported award and determination was illegal and void on the ground that it was so grossly inadequate as to amount to fraud, and on the further ground that the arbitrators improperly attempted to construe the policy of insurance. At the trial, it was stipulated that plaintiffs had actually expended $1,877.27 in repairing the damage.

The court submitted two specific questions to the jury:

(1) "Did the oil burner at 1641 Eleanor Street stop operating on or between December 27 and December 31, 1946, because of an explosion on these premises within that time?"

(2) "Was the explosion, if you have found that there was one, the direct and natural cause, in the ordinary course of events, of the freezing of the water in the heating plant and plumbing at 1641 Eleanor Street in December, 1946?"

The jury returned an affirmative answer to both interrogatories. The court then adopted the special verdicts and incorporated the same into the findings of fact. In addition to other findings and in line with the jury's determination, the court found:

"As a direct and natural result of said explosion in the ordinary course of events the water in said heating plant and in the plumbing in said premises froze, damaging the heating plant and plumbing in the sum of $1,877.27."

Defendant does not question that an explosion took place as claimed by plaintiffs, but contends that the loss and damages ad-

mittedly caused by the freezing of water within plumbing and heating installations cannot possibly be a direct loss or damage by explosion, and that therefore there can be no recovery under the terms of the policy.

■ The principal question for our determination is whether the loss or damage caused by the freezing of water within plumbing and heating pipes of an insured dwelling, where such freezing resulted from the failure of an oil-burning furnace to function because of an explosion in the combustion chamber, is a direct loss or damage by explosion, so as to permit recovery for such loss or damage under the terms of a policy of fire insurance, the coverage of which under its language "is extended to include direct loss or damage by * * * explosion."

Two decisions of this court point the way for determination. They are Ermentrout v. Girard F. & M. Ins. Co. 63 Minn. 305, 65 N. W. 635, 30 L. R. A. 346, 56 A. S. R. 481, and Russell v. German F. Ins. Co. 100 Minn. 528, 111 N. W. 400, 10 L.R.A.(N.S.) 326. These cases are often referred to by courts of other jurisdictions and are considered leading cases. The Ermentrout case involved an action on a fire insurance policy insuring "against all direct loss or damage by fire" on an elevator building. The insured building was adjacent to another used as a feed mill, with a partition wall between them. The fire was confined to the feed mill, which fell, carrying with it the partition wall and part of the elevator building. No part of the elevator building was ignited or consumed by the fire. The court assumed that the feed mill caught fire before it fell and that the fall was caused by the partial consumption of the feed mill and the weakening of the partition wall by the fire. It said (63 Minn. 307, 65 N. W. 636):

"* * * If such were the facts, then we think the falling of the insured building was a 'direct loss or damage by fire,' within the meaning of the policy.

"* * * To render the fire the immediate or proximate cause of the loss or damage, it is not necessary that any part of the insured property actually ignited or was consumed by fire."

Mr. Justice Mitchell, who wrote the opinion in the above case, defined the word "direct" as used in a fire insurance policy as follows (63 Minn. 308, 65 N. W. 636) :

"* * * The word 'direct,' in the policy, means merely 'immediate,' or 'proximate,' as distinguished from 'remote.' "

In the Russell case, a three-story building was insured against loss or damage by fire. Fire consumed the interior of an adjacent five-story building, leaving standing an unsupported brick wall 69 feet high. Seven days later a strong wind arose, and the brick wall fell upon plaintiff's insured three-story building, causing damage. The question involved in the case was whether under the terms of the policy the fire was the cause of the damage. The court stated that the evidence was sufficient to sustain the trial court's finding that a strong wind was blowing when the wall fell, but that it was not of greater velocity than was likely to occur in that vicinity in any month or season of the year. In disposing of the case favorably to the insured, this court stated (100 Minn. 538, 111 N. W. 404) :

"* * * it is evident that the contract must be considered from the standpoint of the parties at the time of its execution, in the light of the surrounding circumstances. The risk as defined by the policy covered whatever causes produced the result. The inquiry resolves itself to determining whether or not the wind was an incident in the chain of events, or the primary cause. If, at the time the contract was entered into, windstorms of the character which arose on the night of December 13 [*sic*] were liable to occur at any time, then the parties contracted with reference to such a possibility. If they could reasonably have foreseen that a fire might leave the wall, sixty nine feet high and one hundred and fifty seven feet long, exposed to winds likely to occur, and that such a wind might blow it down, then such contingency was an element in the risk. * * * The question is not alone, how much was the standing wall weakened by the fire? but rather, did the fire leave the wall in such an exposed condition that the wind produced an effect which would not have been produced except for the fire?

"* * * Although the later agency [the wind] in the work of destruction, was it the real cause of the damage? The wind was not the cause, if it was an intervening agency which could reasonably have been foreseen. It could not reasonably have been foreseen if it was an improbable event, not likely to occur. Winds, such as arose December 20, were liable to occur at any season of the year."

Application of the reasoning of the Russell case to the facts of the instant case will lead us to the result reached in that case. Explosions of the kind here involved are not uncommon, according to the evidence. When a leak occurs in the hot-water coil installed in the combustion chamber of an oil-burning furnace, the water, which is under pressure, will naturally escape into the chamber. When the water comes in contact with the hot firebricks, steam is so quickly formed that an explosion follows. A short occurs in the water-soaked electrodes, and the fire goes out. If this occurs in freezing weather, there is but one natural result, unless human efforts intervene and restore heat. The contract here involved must be considered from the standpoint of the parties at the time of its execution, in the light of surrounding circumstances, as was stated in the Russell case. When this contract was entered into, it could reasonably have been foreseen that, if in freezing weather the furnace were put out of commission by an explosion and the heat supply thus cut off, the water in the heating and plumbing systems would freeze and burst the pipes. It is reasonable to say that the parties contracted with reference to the contingency of an explosion in the furnace, with a resulting stoppage of heat. If they contracted with reference to such a contingency, did they not also contract with reference to what inevitably must follow such an explosion if it occurs in subzero weather? The wind that followed the fire in the Russell case was not unusual. But such a wind would not as inevitably follow a fire as would freezing in an unheated house. Counsel argues that the explosion did not cause the freezing. Neither did the fire cause the wind in the Russell case, but, in the opinion of the court, the parties contracted with reference to the

possibility that windstorms of the character which blew down the wall were liable to occur at any time. And so, if the parties could reasonably foresee such a wind and a wall left standing after a fire exposed to such a wind, such a contingency would be an element in the risk. The freezing in the instant case was not remote to the occurrence of the explosion, but an immediate and direct result. To say that subzero weather in Minnesota in midwinter is something that the parties did not contract with reference to is to ignore realities. The result here was more readily foreseeable than that in the Russell case. There is more certainty that water pipes will freeze if an explosion puts a heating unit out of commission in frigid weather than that a wall left standing after a fire will be blown down by the wind. In our opinion, the loss was within the reasonable intent of the parties when they made their contract.

In Norwich Union F. Ins. Society, Ltd. v. Board of Commrs. (5 Cir.) 141 F. (2d) 600, an explosion and ensuing fire in a grain elevator disabled drying machinery, resulting in deterioration of corn. Two policies of insurance had been issued covering grain. One policy insured against all direct loss or damage by explosion, and the other insured against all direct loss or damage by fire. Insurer contended that, since no damage was done to the grain by the fire, by the heat therefrom, or by any agency used in extinguishing the fire, but resulted solely from deterioration caused by properties within the grain itself, the loss was due to consequential and remote causes not covered by the policies. The court held that the damage to the corn proximately resulted from the fire and was within the coverage of the policies. In that case, insurer did not deny that it had knowledge at the time the policies were issued that damage to the stored corn inevitably would flow from any prolonged failure of the machinery to function. In the instant case, damage to the heating and plumbing system would inevitably flow from failure of the furnace to function in freezing weather. No one can deny knowledge of such a fact. In our opinion, under the terms of the policy and the undisputed facts, plaintiffs are entitled to recover for their loss.

In Pennsylvania F. Ins. Co. v. Sikes, 197 Okl. 137, 168 P. (2d) 1016, 166 A. L. R. 375, an insurance contract on household goods covered loss and damage by windstorm, but expressly excluded damage by floodwaters. The personal property insured was blown into a flooded street by force of the wind alone. Upon recovery from the floodwaters, the property was found to be broken and water-soaked. The court said (197 Okl. 140, 168 P. [2d] 1019):

"* * * Common experience and understanding suggest that when personal property of this nature is blown into a body of water, some water damage will likely result before the property can be recovered. It is fair to assume that under these facts this incidental water damage was within the terms of the policies and contracts of the parties at the time they were made."

Russell v. German F. Ins. Co. 100 Minn. 528, 111 N. W. 400, 10 L.R.A.(N.S.) 326, was quoted with approval.

The following cases in other jurisdictions bear on the question here involved: Norwich Union F. Ins. Society, Ltd. v. Board of Commrs. (5 Cir.) 141 F. (2d) 600; Lanasa Fruit S. S. & I. Co. v. Universal Ins. Co. 302 U. S. 556, 58 S. Ct. 371, 82 L. ed. 422; Pearl Assur. Co. Ltd. v. Stacey Bros. Gas Const. Co. (6 Cir.) 114 F. (2d) 702; Jordan v. Iowa Mut. Tornado Ins. Co. 151 Iowa 73, 130 N. W. 177, Ann. Cas. 1913A, 266; Reeves v. National F. Ins. Co. 41 S. D. 341, 170 N. W. 575, 4 A. L. R. 1293; Bird v. St. Paul F. & M. Ins. Co. 224 N. Y. 47, 120 N. E. 86, 13 A. L. R. 875; Brandyce v. U. S. Lloyds, Inc. 239 N. Y. 573, 147 N. E. 201.

In the very recent case of Despatch Oven Co. v. Rauenhorst, 229 Minn. 436, 40 N. W. (2d) 73, there is a full discussion of what is meant by damages which accrue as a consequence of such breach as the parties contemplated when making the contract, and numerous cases are cited.

■ Defendant further contends that the court erred in setting aside the award of the appraisers. In compliance with the terms of the contract and statutory procedure, appraisers were selected. They made an award of $1,137.25. At the trial, the parties agreed

that plaintiffs, the policyholders, spent $1,877.27 to repair the damage caused by the freezing. After the case had been called for trial and before any testimony was taken, the court made the following statement, referring to a stipulation entered into as a result of a pretrial conference:

"* * * As to the question of the inadequacy of the award, that is to be determined upon the theory that the actual damages amounted to $1877.27 whereas the special finding of damages by the arbitrators under the policy provision for arbitration was 1137.25. It was further stipulated that if it is determined that the plaintiff is entitled to recover, then the recovery shall be the amount of the award *unless the court determines that the award should be set aside by reason of its inadequacy under the rules applicable to such a situation* and in that event the recovery of the plaintiff shall be the sum of 1877.27. Is that correct?"

Counsel for plaintiff replied, "I think that's correct," and counsel for defendant said, "Yes." Thus it was agreed that the court should limit its scrutiny of the award to a comparison of the two figures only, and "under the rules applicable to such a situation." By a comparison of the figures alone, without any evidence of fraud or of any other ground upon which an award may be vacated or set aside, the court did set aside the award on the ground that it was "inadequate, unfair, and unjust." He did not say that it was so inadequate as to amount to fraud.

Under the terms of the stipulation, the adequacy or inadequacy of the award must be determined under the rules of law laid down by this court in its decisions. And in doing so it must be kept in mind that the two figures are the only facts involved. In other words, was the trial court legally justified in setting aside the award as a matter of law with no other facts entering into its determination than that the appraisers made an award of $1,137.25 and that plaintiffs actually expended $1,877.27 in making the repairs? The award made by the appraisers was 60.5 percent of the actual cost of the repairs.

An award in arbitration is attended with every presumption of validity. It will not be vacated unless it clearly appears that it was the result of fraud or because of some misfeasance or malfeasance or wrongdoing on the part of the appraisers. If it is attacked for fraud or other permissible grounds, the burden of the assault rests with the attacking party, and to prevail he must establish the fraud or other ground relied on by clear allegations and proof. McQuaid Market House Co. v. Home Ins. Co. 147 Minn. 254, 180 N. W. 97; Di Re v. Fire Assn. of Philadelphia, 156 Minn. 281, 194 N. W. 755; Bahr v. Union F. Ins. Co. 167 Minn. 479, 209 N. W. 490; Kaufman Jewelry Co. v. Firemen's Ins. Co. 168 Minn. 431, 210 N. W. 289; Kaufman Jewelry Co. v. Insurance Co. of Pennsylvania, 172 Minn. 314, 215 N. W. 65, 431; Robertson v. Boston Ins. Co. 184 Minn. 470, 239 N. W. 147. Mere inadequacy of an award is not sufficient ground for setting it aside. But in particular cases it may be so gross as to evidence or to establish fraud or corruption or partiality or malfeasance or misfeasance on the part of the appraisers. Baldinger v. Camden F. Ins. Assn. 121 Minn. 160, 141 N. W. 104; Kaufman Jewelry Co. v. Insurance Co. of Pennsylvania, 172 Minn. 314, 215 N. W. 65, 431; Harrington v. Agricultural Ins. Co. 179 Minn. 510, 229 N. W. 792, 68 A. L. R. 1340; Robertson v. Boston Ins. Co. 184 Minn. 470, 239 N. W. 147.

In the Baldinger case we stated (121 Minn. 162, 141 N. W. 105):

"* * * It is settled law that an award is not invalidated because of mere inadequacy. To invalidate the award, the inadequacy must be so gross as to justify a legitimate inference and finding of fraud."

In the Kaufman Jewelry Co. case, the court, speaking through Mr. Justice Stone, said (172 Minn. 317, 215 N. W. 66):

"Judges have not yet agreed upon any general rule for the avoidance of awards. They concur only as to some of the elements of the problem. They agree, for example, that awards cannot be lightly set aside and that they. are attended with every presumption of validity. McQuaid M. H. Co. v. Home Ins. Co. 147 Minn. 254, 180

N. W. 97. This court holds that while an award cannot be vacated for mere inadequacy, there may be inadequacy so gross as to justify invalidation on the ground of fraud. Baldinger v. Camden Fire Ins. Assn. 121 Minn. 160, 141 N. W. 104. There is general agreement in the proposition, whatever it may mean, that when an award is so grossly inadequate or excessive as to amount to fraud it may be vacated."

■ In Baldinger v. Camden F. Ins. Assn. 121 Minn. 160, 141 N. W. 104, an award of $470.83, being 49.6 percent of the loss of $950, was vacated and set aside, while in Goddard v. King, 40 Minn. 164, 41 N. W. 659, an award of $30,000, being 60 percent of the loss of $50,000 was affirmed. In Bahr v. Union F. Ins. Co. 167 Minn. 479, 209 N. W. 490, an award of $800, being 160 percent of the loss of $500, was affirmed as not being excessive, while in Harrington v. Agricultural Ins. Co. 179 Minn. 510, 229 N. W. 792, 68 A. L. R. 1340, an award of $11,304.52, being 323 percent of the loss, was vacated as excessive. In Hoffman v. DeGraaf, 109 N. Y. 638, 16 N. E. 357, an award of 55 percent of the loss was affirmed, and in Second Society of Universalists v. Royal Ins. Co. Ltd. 221 Mass. 518, 109 N. E. 384, Ann. Cas. 1917E, 491, an award of 57.6 percent of the loss was upheld. In the instant case, as stated, the award was 60.5 percent of the loss; and, as there is nothing to uphold or vacate the award except the bare figures submitted, it would seem that under our decisions it is not so inadequate as to compel vacation.

The order denying the motion for a new trial is affirmed, and the case is remanded with directions to proceed on the basis above indicated.

Affirmed and remanded with directions.