17770

SOUTH CAROLINA ELECTRIC & GAS COMPANY *et al.,* Respondents, v. AETNA INSURANCE COMPANY *et al.,* Appellants

(120 S. E. (2d) 111)

250·

*Messrs. Joseph L. Nettles, Belser & Belser* and *Robinson, McFaddin & Moore,* of Columbia, for *Appellants,*

*Messrs. Arthur M. Williams, Jr., Cooper & Gary* and *Mc-Lain & Sherrill,* of Columbia, *for Respondents,* 

*Messrs. Joseph L. Nettles, Belser & Belser* and *Robinson, McFaddin & Moore,* of Columbia, *for Appellants, in Reply,*

April 27, 1961.

LEGGE, Justice.

Respondent South Carolina Electric & Gas Co. brought this action in May, 1953, against thirty-eight defendant insurance companies, which by separate policies had covered its properties against loss or damage by fire, alleging that as the result of a fire on June 27, 1950, in one of its generators, it had sustained loss within the coverage of said policies in the amount of $132,181.95, for which amount and interest it prayed judgment, to be apportioned against them in accordance with the coverage of the respective policies. The present appeal, the fourth in this case, is from a judgment of the court of common pleas for Lexington County in favor of respondents, in the amount of $67,200.00 with interest from September 1, 1952. The numerous exceptions involve, substantially, four questions:

1. Was there evidence to support the jury's conclusion that there was an "ensuing fire" within appellants' coverage?

2. Did the trial judge err in refusing to grant a new trial absolute because of the excessiveness of the verdict?

3. Was there error in the charge as to the measure of damages?

4. Was it error on the part of the trial judge to exclude from evidence certain correspondence relative to dealings between respondent and Lloyd's of London, and to refuse appellants' requests to charge concerning coverage under Lloyd's policy?

In addition to the coverage of appellants' policies, respondent was insured, under a policy issued by The Underwriters at Lloyd's (also referred to in the course of this litigation as Lloyd's of London, and as Lloyd's), against loss or damage directly caused by accident to certain insured objects, including the generator before mentioned, described in an attached schedule. This policy limited the insurer's liability to the amount of the insured's ultimate net loss in excess of $10,000.00, limited total liability for loss from any one accident to $150,000.00, and excluded from coverage loss from fire outside the insured object and loss from accident caused by fire. It defined "accident" as "a sudden and accidental breaking, deforming, burning-out or rupturing of the object or any part thereof which manifests itself at the time of its occurrence by immediately preventing continued operation or by immediately impairing the functions of the object, and which necessitates repair or replacement before its operation can be resumed and its functions restored."

The defendants alleged in their answer:

1. That the damage to the generator was not within the coverage of their policies, but was caused by mechanical breakdown or electrical injury;

2. That prior to the electrical or mechanical failure of June 27, 1950, the generator had been operated in a defective

condition, of which plaintiff had knowledge; and that such operation increased the hazard of damage and consequently relieved the defendants from liability because of the "increased hazard" provision in their respective policies; and

3. That Lloyd's, having paid the plaintiff on account of the loss complained of, was the real party in interest.

Plaintiff, replying: denied that it had by any act or omission increased the hazard within the meaning of the policies; denied that it had operated the generator at any time in a defective condition or in an improper manner; denied that Lloyd's had paid it on account of the loss as alleged in the answer; but admitted that in connection with the said loss it had borrowed a sum of money from Lloyd's under a Loan Receipt Agreement, of which a copy had been furnished to the defendants. The Loan Receipt Agreement acknowledged receipt from Lloyd's of $122,218.95 as a loan, repayable only from any net recovery which South Carolina Electric & Gas Co. should make from any person or corporation on account of the loss in question, the proceeds of such recovery to be applied first to expenses of suit, including attorneys' fees, and then to repayment of the loan.

The defendants thereupon moved: (1) for an order requiring Lloyd's, as the real party in interest, to be substituted as plaintiff in the place of South Carolina Electric & Gas Co.; and (2) for an order requiring production and permitting inspection of all agreements as to attorneys' fees to be paid out of any recovery that might be obtained in the action. The first of these motions was disposed of by an order directing that Lloyd's be made a party co-plaintiff with South Carolina Electric & Gas Co., and that if it should decline, or fail within ten days to indicate its intention, to so join, South Carolina Electric & Gas Co. should implead it as a party defendant. The second motion was refused. Upon appeal by the defendants we affirmed both orders, 230 S. C. 340, 95 S. E. (2d) 596, and expressly held: that the right of action was vested in South Carolina Electric & Gas Co.;

that the issues under the pleadings required for their determination no additional parties; that Lloyd's was not a necessary party at all, but its joinder, as a proper party, was within the discretionary power of the court; and that disposition by South Carolina Electric & Gas Co. of any recovery that it might obtain in the cause was a matter with which the defendants would have no concern.

Following that decision Lloyd's became a party co-plaintiff and the case came on to be tried, resulting in a verdict for $138,000.00. The trial Judge, having overruled defendants' motions for nonsuit, direction of verdict, and judgment *n. o. v.*, concluded that the verdict was excessive and ordered a new trial upon the issue of damages only. The defendants appealed, presenting four questions, which we disposed of as follows, 233 S. C. 557, 106 S. E. (2d) 276:

1. Was there evidence from which the jury could reasonably have found that the loss was within the coverage of appellants' policies? We answered that question in the affirmative, refraining from review of the evidence because of our disposition of question 4.

2. Had the respondents proven recoverable damages? That question we also answered in the affirmative, saying: "The evidence relating to loss included the original cost of the damaged generator, estimated length of useful life, age, and cost of replacement of the parts, of which some were damaged by electrical injury or ensuing fire from which the jury may have determined the actual cash value of the latter at the time of loss, which is the measure of damages under the terms of the policies."

3. Should South Carolina Electric & Gas Co. have been dismissed as not a proper party to the action, because of the payment to it by Lloyd's and the terms of the loan receipt in that transaction? We held that this question had been disposed of by the decision upon the first appeal, which had plainly held the right of action to be vested in South Carolina Electric & Gas Co. alone; and that such holding was the law of the case.

4. Was it proper to grant a new trial as to damages only? We held that such practice was not countenanced in the modern decisions of this court, and that in the absence of a statute or rule authorizing it we would not approve so important an innovation in our procedure; and accordingly we remanded the case for a new trial of all issues.

On the next appeal, 235 S. C. 147, 110 S. E. (2d) 165, we affirmed a circuit court order denying the defendants' motion to change the venue from Lexington to Richland County.

Thereafter, on September 21, 1959, the case came on for trial before the Honorable Thomas P. Bussey, Presiding Judge, and a jury. He denied the defendants' motion for directed verdict and submitted the case to the jury, which found for the plaintiffs $87,000.00. The parties had theretofore stipulated that interest should be computed from September 1, 1952, on any amount that might be found to be due. Defendants then moved for judgment *n. o. v.* or, in the alternative, for a new trial; and by his order of July 11, 1960, Judge Bussey denied these motions but ordered a new trial unless the plaintiffs should remit so much of the verdict as exceeded $67,200.00 (with interest from September 1, 1952, as stipulated). Plaintiffs remitted accordingly, and the defendants have appealed.

The defendants' policies each contained an "Electrical Apparatus Clause" to the effect that there should be no liability "for any electrical injury or disturbance to the said electrical appliances or devices from artificial causes, unless fire ensues * * *". The coverage under these policies, to be apportioned among the several companies, was "to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss * * *".

Lloyd's policy, as we have before mentioned, covered the generator in question against "sudden and accidental break-

ing, deforming, burning-out or rupturing * * * which manifests itself at the time of its occurrence by immediately preventing continued operation or by immediately impairing the functions * * * and which necessitates repair or replacement before its operation can be resumed and its functions restored." Subject to the deductible amount of $10,000.00 and the maximum liability of $150,000.00, Lloyd's liability was for "ultimate net loss" defined in the policy as "the amount actually expended * * * to repair or replace the property damaged or destroyed in a condition equal to but not superior to or more extensive than its condition when new."

It is undisputed that on the afternoon of June 27, 1950, an electrical fault, accompanied by electrical fire, or arcing, occurred in the No. 1 generator at South Carolina Electric & Gas Co.'s hydro-electric power plant at Lake Murray in Lexington County. The crucial issue upon the trial was whether damage resulted from fire ensuing after the electrical fault, as distinguished from the fire of the fault itself.

The generator's principal components are the stator and the rotor. The former is a stationary drum or cylinder of laminated iron, some seven feet in height and thirty feet in diameter; around its inner surface are three hundred eighty-four slots, each holding an insulated copper coil the top end of which extends above the iron and, overlapping about twelve coils, is connected with another coil. Between the coils are wooden spacer blocks. Inside the stator is the rotor, a magnetized unit, the rapid rotation of which generates electricity in the coils of the stator.

Plaintiff's employees on duty near the generator at the time of the accident testified in substance as follows:

About 3:30 p. m. on June 27, 1950, a severe "bump" was felt, indicating malfunction of a generator. Within six-tenths of a second all sources of power had been automatically removed from the generator. The switchboard operator, one floor above, applied brakes to bring the rotor to a stop; while it was slowing down some residual voltage was gen-

erated, during the decay of the magnetic field, for a period of some two seconds. The rotor was brought to a stop approximately a minute and a half after the "bump". While it was still turning, employees saw sparks and smoke coming out of ventilator holes in the stator. When the rotor stopped, they removed an inspection plate and saw within the generator flames and black smoke. As described by one witness, the flame was dark red, a slow, rolling flame that came up and curled when it hit the cover plate. The fire was all over the coils. The flame did not resemble an electrical arc. Pyrene extinguishers played into the generator put out the flame within a minute or so. There was testimony, by the company's executive vice-president, to the effect that the arc of the fault could not have lasted more than two seconds and would have been insignificant except for the first second.

Damage was chiefly to the stator. In the immediate vicinity of the arc, three coils were volatilized. In the direction of rotation of the rotor, and therefore of the wind from its fans, the next eight coils were badly carbonized; on the next twenty the insulation was burned or charred to a lesser degree; the next twenty-five were burned on their outer surfaces. In the area of the first eleven coils before mentioned the wedge-shaped wooden spacer blocks were badly burned and charred; beyond, they were charred to a lesser degree.

Expert testimony for the respective parties presented divergent views as to what, in the opinion of the witnesses, would constitute "electrical injury" and what "ensuing fire."

In this aspect of the appeal review of the evidence in further detail would serve no useful purpose. We have carefully considered all of it; we find it substantially the same as that in the former trial which we held, 233 S. C. 557, 106 S. E. (2d) 276, presented, as a jury issue, the question whether or not there was an "ensuing fire" within the coverage of appellants' policies; and we think that under it the presiding judge in the trial now under review properly submitted that issue to the jury.

The generator, installed in 1930, had been in operation twenty years when the accident of June 27, 1950, occurred. As the result of the damage on that occasion, all of the stator coils had to be rewound and replaced in order to restore it to proper operating condition. Replacement of the badly damaged coils alone was impracticable because the insulation on the others was brittle, an incident of their long service, and although satisfactory for continued operation in place, would have cracked if disturbed. There was evidence that machines of this type had been in operation for fifty years and longer with the same windings; that the life of such coils depends upon the manner of operation and the amount of electrical load carried. In the opinion of the field service engineer of Westinghouse Electric Corporation, their average useful life is about forty years.

The original cost of the generator in question was $202,-250.00; estimated cost of replacement was between $500,-000.00 and $600,000.00. There was no evidence of the cost or value of the stator alone. The estimated original cost of the stator coils, or windings, was about $50,000.00. The total cost of repairs was $132,181.00, of which $90,300.00 represented the cost of the new coils and rewinding material, and between $15,000.00 and $16,000.00 the cost of labor furnished by the manufacturer. The cost of the new coils, installed, exclusive of certain expenses of removal and maintenance, was approximately $112,000.00.

Since the issues raised by appellant's second and third questions—as to excessiveness of the verdict and error in the charge on measure of damages—are closely related, we discuss these questions together.

The coverage under appellants' policies was, as before stated, "to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss. * * *" In the course of his charge the trial judge, after

quoting the coverage provision just mentioned, went on to say that the maximum amount to which the plaintiffs could be entitled under the contract was the "actual cash value of the stator, installed in the generator, before the occurrence on June 27, 1950, taking into account its age and condition and the period beyond that date during which its useful economic life might reasonably be expected to have extended." He thereupon explained that the policy provision that "the amount shall not exceed the sum which it would cost to repair or replace the damaged property" was not in itself a measure of recovery, but was, instead, a limitation on the amount of recovery allowable under the "actual cash value" provision.

Appellants urge that this portion of the charge was erroneous in that: it authorized the jury to bring in a verdict for an amount equal to the actual cash value of the stator on June 27, 1950, whereas the limit of recovery should have been the actual cash value of the coils destroyed or damaged; it permitted the jury to speculate as to the actual cash value of the stator, as to which there was no evidence; it was a charge on the facts because the stator was not destroyed; and it was counter to the statement of this court on the former appeal, 233 S. C. 557, 106 S. E. (2d) 276, that the measure of damage was the cash value of the damaged parts.

■ Considered alone, the portion of the charge here questioned is vulnerable to appellants' attack upon the ground that it incorrectly stated the measure of maximum recovery. But the following excerpts from the remainder of the charge clearly show that the trial judge did not intend to leave the jury under the impression that they could find a verdict up to the actual cash value of the stator immediately prior to the accident:

"The measure of damages under the loss may be arrived at by determining the difference between the value of the damaged property immediately before and immediately after the fire * * *.

"I charge you further, as to the measure of damages, the fire insurance policies provide that the fire insurers will pay 'the actual cash value of the property at the time of the loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality'; and in connection therewith I charge you that cost of the replacement and repairs is not conclusive as to this actual value but it is evidence of the value and may be considered by you along with the other evidence in determining the amount of damages, if any; and you may consider the evidence of both the actual cash value of the damaged property which has been offered in this case and also the evidence of the cost of repairs to aid you in arriving at the proper amount of damages * * *.

"I charge you that if you find that the defendants are liable for the damage which occurred on June 27, 1950, if any, the measure of damages is the actual cash value of the property destroyed or damaged on that date but not exceeding the cost of repair or replacement * * *.

"I charge you further that the property which was destroyed or damaged on June 27, 1950, had been in use since 1930. Therefore, in determining the actual value in 1950, you may consider the new value or cost thereof and take into consideration any depreciation of the property between 1930 and 1950 to be deducted from the new value or cost. In other words, Mr. Foreman and gentlemen, I charge you that that is one thing that you may consider in arriving at damages. It's not the only rule, it's nothing final or conclusive, but it's one rule that you may follow, if you find that the plaintiffs are entitled to recover."

Whether the inaccuracy complained of was sufficiently removed by the later portions of the charge just quoted may well be doubted. But, assuming that the error was not so cured, we do not think that it requires reversal; for it is manifest from the verdict that the jury disregarded it. Cf. *Black v. Atlantic Coast Line R. Co.,* 82

S. C. 478, 64 S. E. 418; *Trexler Lumber Co. v. Wilson,* 96 S. C. 176, 80 S. E. 271; *Taylor v. United States Casualty Co.,* 229 S. C. 230, 92 S. E. (2d) 647.

By the same token, we do not think that the absence ■ of direct evidence of the actual cash value of the stator was fatal to the verdict or requires reversal because of the trial judge's reference to it. Actually, the damaged "property" could have been considered to be either the entire generator or the stator, its largest component. And it is quite true that whether the insured "property" be considered as the generator or as the stator, reference to the actual cash value of either as the maximum possible recovery in the instant case was inaccurate, because the evidence plainly showed that neither was destroyed or had to be replaced. If the insured property was the generator or the stator, the loss was a partial one; if the stator coils, it was total. In either event the "actual cash value" of the coils, by which maximum recovery was to be limited, was not their cost in 1930, nor the bare purchase price of the new coils subjected to the percentage of depreciation applicable to the piece of machinery of which they were to become a part, but the amount that it would cost the insured to replace the old coils with others of like kind and value as of the date of the loss. Appleman, Insurance Law and Practice, Sections 3823, 3861; *Fedas v. Insurance Co. of State of Pennsylvania,* 1930, 300 Pa. 555, 151 A. 285; *Farber v. Perkiomen Mutual Ins. Co.,* 1952, 370 Pa. 480, 88 A. (2d) 776.

*Fedas v. Insurance Co. of State of Pennsylvania, supra,* was concerned with partial destruction of a building. The policy provided for indemnity to the extent of the actual cash value, with allowance for proper depreciation of the property at the time of loss, not exceeding cost of repair or replacement. To quote from the opinion [300 Pa. 555, 151 A. 288]:

"There enters into cash value of the part destroyed the fact that it was a part of an entire property and the use made

of it. It is summed up in the idea 'the cost of replacing in as nearly as possible the condition as it existed at the date of the fire.'

"The actual cost of new material, with deduction for depreciation, which is not sufficient to replace the building as nearly as it could be as of the date of the fire, does not comply with the policy, which was to insure against loss not exceeding the amount named in the insurance.

"If the new material is to be depreciated to reach the actual cash value contemplated by the policy, the timber or part destroyed must be considered in connection with the whole structure and valued accordingly, and should reflect the use in place. The result reached is that called for in the policy—replacement as nearly as possible, or its cost. If part of the building destroyed cannot be replaced with material of like kind and quality, then it should be substantially duplicated within the meaning of the policy.

"Complaint is made that the estimate in evidence was based on the cost price of new material, without depreciation, for the restoration of a frame building at least four or five years old. This technical objection to the offer, because it was new material undepreciated, is without merit, since the estimate had value as evidence bearing on the ultimate question * * *. To sum up, 'actual cash value' means the actual value expressed in terms of money of the thing for the purpose for which it was used; in other words, the real value to replace."

In the case at bar the coils were at the time of the fire twenty years old; there was evidence warranting inference that they would have had thirty years more of useful life; they could not be replaced with coils of their own age; new coils were necessary. There was testimony to the effect that the actual cost of the new coils, in place, was $132,181.00, of which $90,300.00, representing the cost of materials, would be depreciable, and the balance, 41,881.00, representing cost of winding and installation, would not be depreciable. The cost of the new materials, depreciated to sixty

(60%) per cent to conform with the depreciated life of the old as above mentioned, would be $54,180.00. Addition to this figure of the undepreciable $41,881.00 of replacement cost, would indicate that the actual cost of the new coils, in place, after depreciation, was $96,061.00, a figure substantially higher than the jury's verdict.

It is thus apparent that the jury was not misled by the erroneous reference to the actual cash value of the stator (which, as appellants' counsel concede, was probably at least fifty per cent of the value of the entire generator) as the measure of maximum recovery; that the verdict, supported by the evidence, reflected an amount less than the actual cash value, as hereinbefore defined, of the coils themselves, and therefore less than the true measure of maximum recovery; and that the error was therefore not prejudicial.

Based on a forty per cent depreciation, the actual cost of the new coils in place, as before mentioned, was $96,061.00. Calculating depreciation at fifty per cent (as suggested by the testimony of Mr. Kindelberger, the field service engineer of Westinghouse), the actual cost of the new coils in place was $87,031.00. The verdict, $87,-000.00, is in our opinion not vulnerable to the charge of excessiveness requiring a new trial absolute.

The final assignment of error is based upon the trial judge's exclusion from evidence of the following documents:

1. A memorandum from the Vice-President of South Carolina Electric & Gas Co. to that company's Comptroller, dated January 20, 1953, advising of receipt by Messrs. Mendes & Mount (Lloyd's attorneys) of a check from Lloyd's payable to South Carolina Electric & Gas Co. for $122,281.95, "in payment of their liability in connection with the Saluda Hydro Excess Turbine loss on Generator No. 1 which resulted from accident of June 27, 1950."

2. A letter, dated August 14, 1952, from H. E. Garrett, of Ebasco (a service organization that negotiated the Lloyd settlement through Mendes & Mount), to the effect that the

only item holding up the formal adjustment procedure with Lloyd's was "the status of the law in South Carolina concerning the manner in which the payment is to be made in view of the fact that as representatives of Underwriters, Mendes & Mount plan to immediately initiate subrogation action against the fire insurance companies to recover the payment made in connection with this occurrence."

The sole issue in the case was whether the loss was within the coverage of appellants' policies. On the first appeal, 230 S. C. 340, 95 S. E. (2d) 596, we considered the Loan Receipt transaction between Lloyd's and South Carolina Electric & Gas Co.; rejected the contention that Lloyd's should be substituted as plaintiff; and held that the right of action was vested in South Carolina Electric & Gas Co. alone, and that its disposition of any recovery that might be had was of no concern to the defendants. On the second appeal, 233 S. C. 557, 106 S. E. (2d) 276, the defendants renewed their contention that Lloyd's was the real party in interest and should be substituted as plaintiff in the stead of South Carolina Electric & Gas Co.; and we again rejected it.

The obvious purpose for which the memorandum and the letter were offered in evidence was to inject into the case the issue of Lloyd's liability under its policy. That issue was foreign to the one being tried. The trial judge, in view of the. pleadings (no motion having been made to strike Lloyd's as a party or to strike the allegation in the answer that Lloyd's had paid South Carolina Electric & Gas Co. on account of the loss), had admitted the Lloyd policy in evidence over plaintiffs' objection and had admitted also the Loan Receipt, dated January 26, 1953, which plaintiffs had offered in evidence. He ruled the memorandum and letter inadmissible, as being in the nature of negotiations leading to the settlement that was consummated by the Loan Receipt; but held that both the Lloyd policy and the Loan Receipt were subject to comment by counsel in argument to the jury to the extent that they might be considered as ad-

missions by the plaintiffs against their interest on the question of whether or not there had been an "ensuing fire", but not as bearing on any question of liability as between Lloyd's and South Carolina Electric & Gas Co. The relevancy of the Lloyd policy and the Loan Receipt to the issue on trial may well be doubted; but that question is not before us. They were admitted in evidence as bearing on the issue of "ensuing fire". The letter and inter-office memorandum preliminary to the Loan Receipt were of at least doubtful competence, and their admission would have tended further to distract the jury's attention from the real issue in the case. The conduct of a trial, including admission or rejection of evidence, must be left largely to the trial judge's discretion. *Chastain v. United Insurance Co.,* 230 S. C. 465, 96 S. E. (2d) 464. In the case at bar, it is our opinion that rejection of the letter and memorandum did not constitute abuse of discretion or prejudice any legal right of the defendants.

A somewhat similar question is presented by the exceptions to the trial judge's refusal to charge the defendants' first and ninth requests. The first request involved a comparative analysis of the coverages under Lloyd's policy and those of the defendants; the ninth asked that the jury be instructed that since Lloyd's had paid to South Carolina Electric & Gas Co. more than $122,000.00 and had taken an assignment of the latter's claim, and since the amount so paid exceeded any possible recovery in the case at bar, whatever verdict they might find would go to Lloyd's and not to South Carolina Electric & Gas Co. The trial judge, refusing these requests, charged instead that the defendants had pleaded that the loss was not within their coverage but was within that of Lloyd's policy; that the Lloyd policy was for the jury's consideration only with regard to whether or not there was liability under the defendants' policies; and that the jury was to be concerned not with the question of whether there was liability under the Lloyd policy or with any issue that might exist between

South Carolina Electric & Gas Co. and Lloyd's, but solely with the isue of liability under the defendants' policies. We find no error here. The instructions requested would have directed the jury's deliberations to matters beyond the limited issue hereinbefore discussed.

In his charge, the trial judge defined "fire" as "the effect of combustion * * * equivalent to ignition or burning which includes visible flame or glow", and as "the active principle of combustion characterized by the heat and light of burning." The appellants, conceding this to be a sound nontechnical definition, contend that it did not meet the issue of "ensuing fire" in the sense used in their policies. They also take exception to that portion of the charge wherein the trial judge, referring to "electrical injury", said: "To further define for you the court's conception of 'an electrical injury', I charge you that an electrical injury is an injury caused by electrical current. It generally involves overheating due to excessive current or excessive voltage as a result of shortcircuiting or overloading." As to this, they contend that it had the effect of eliminating from "electrical injury" flame, smoke and combustion in the course thereof and accompanying such injury, and enabled the jury to find that any fire in connection with or accompanying the electrical injury was an "ensuing fire" within the meaning of their policies.

These exceptions are without merit. The excerpts complained of must be considered in context with the rest of the charge on the questions of "fire" and "electrical injury", which we now quote, and from which it is apparent to us that appellants' rights as to those issues were fully protected:

"The first question which you gentlemen must determine from the evidence is whether there was an ensuing fire as well as an electrical injury. In that connection, I charge you that the word 'ensue' means 'to come after, to follow in a chain of events.' And so, if the only elements of fire which occurred came in the course of and accompanied an electrical

injury as a part of the electrical injury, then this would not be an 'ensuing fire'. If, therefore, you conclude that there was no fire except that of the electrical injury itself, you should find for the defendants * * *.

"I charge you further that flame, burning, charring and heating which occur in the course of and as part of an electrical injury are not 'fire' within the meaning of the defendants' policies.

"I charge you that the term 'electrical injury', as used in the defendants' policies, includes the heating, burning, smoke and flame occurring in the course of the breakdown, and such burning and so forth is not 'fire' in the commonly accepted meaning of the word or as used in the insurance contracts issued by the defendants."

We have not overlooked Exceptions 22 and 23, which charge that in his instructions as to the measure of damages the trial judge overemphasized the cost of replacing the damaged coils. Since we have already discussed the measure of damages, further discussion of it seems unnecessary. We have carefully reviewed the charge on this issue and conclude that there was no such overemphasis of the replacement cost as could have resulted in prejudice to the appellants' rights.

Affirmed.

TAYLOR, C. J., and OXNER and MOSS, JJ., concur.