AETNA INSURANCE COMPANY, Appellant,

v.

GETCHELL STEEL TREATING COMPANY, Inc., Appellee.

COMMERCIAL UNION ASSURANCE COMPANY, Ltd., Appellant,

v.

H & L CORPORATION, Appellee.

Nos. 18923, 18924.

United States Court of Appeals Eighth Circuit.

May 16, 1968.

Lawrence Zelle, of Robins, Davis & Lyons, Minneapolis, Minn., for appellants; William B. Stukas, Minneapolis, Minn., on the brief, reply brief and supplemental reply brief.

Frank Claybourne, of Doherty, Rumble & Butler, St. Paul, Minn., for appellees; William H. Bast, St. Paul, Minn., on the brief.

Before MATTHES, GIBSON, and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

The Aetna and Commercial insurance companies appeal from a judgment of the District Court requiring Aetna to pay the Getchell Steel Treating Company $28,-571.48 for damage to two electrical furnaces and requiring the Commercial Union Assurance Company, Ltd., to pay the H & L Corporation, a wholly-owned subsidiary of Getchell, $1,865 [1] for damage to its building and $4,735 for damage to an electrical control panel and its contents. The Court found that the insurers were obligated to make these payments under standard Minnesota fire insurance policies issued to the insureds.

We affirm.

Getchell was in the business of heat treating various steel components for industrial use. It occupied, under lease, a Minneapolis building owned by H & L. It used two electrical furnaces in its heat treating process, and electrical power was distributed to the furnaces through the electrical control panel.

On Sunday, January 30, 1966, Lindstrom, a Getchell employee, was informed that the power had failed. Upon confirming that fact, he called Timm, the plant electrician. Timm examined the panel and found that the main circuit breaker was open. He also found evidence of electrical arcing on the copper bus bars, and proceeded to clean them and the bakelite insulators separating them by wiping away condensation and dust. He then reactivated all the circuits.

The District Court's findings as to what occurred thereafter are stated succintly in its opinion and, in our view, are supported by substantial evidence:

"Approximately one minute after the restoration of electrical power, severe electrical arcing began in the control panel, accompanied by some burning, smoke and soot. There was a loud noise described by Mr. Timm as an electrical explosion. [' * * * *within*

---

1. Commercial does not here contest the fact that the damage to the building was covered by the policy issued by it to H & L. We will, therefore, not discuss this issue in this opinion.

*three seconds after the commencement of the electrical short-circuiting, a "self-sustaining" fire existed.* * *' (Emphasis added.)] The circuit breaker on the control panel did not release as it was designed to do and approximately ten to 30 seconds after the arcing began the fuses on the pole outside burned out and electrical power was interrupted. * * * [A] fire continued to burn within the control panel for approximately five or six minutes, accompanied by extensive smoke and soot. * * *

\* \* \* \* \* \*

" * * * 90% of the damage to the control panel occurred within the first ten seconds after the electrical arcing began."

\* \* \* \* \* \*

"The electrical control panel was rendered inoperable as a result of the occurrence. The solid copper bus bars were melted from the heat of the arc. The insulation on the wiring near the bus bars was charred and burned. The bakelite insulators in the vicinity of the electrical arcing were charred and carbonized. The upper portions of the control panel were covered with smoke and soot, and flashover arcing had occurred within some of the branch circuit breakers. The main circuit breaker was inoperable. * * *

"As a result of the deprivation of electrical energy to the salt bath furnaces, the salt within them solidified or 'froze', causing damage to the furnaces * * *."

The insureds submitted claims to their respective companies contending that all damages to the building, the control panel and the furnaces were covered risks. The insurers refused to pay the claims arguing that the losses were excluded from coverage by the "electrical apparatus clause:"

"This Company shall not be liable for any loss resulting from any electrical injury or disturbance to electrical appliances, devices, fixtures or wiring caused by electrical currents artificially generated unless fire ensues. And if fire does ensue, this Company shall be liable only for its proportion of loss caused by such ensuing fire."

The insured then brought separate actions in Minnesota state court. They were removed by the insurance companies to federal court,[2] where they were subsequently consolidated and tried by the court without a jury.

The trial court concluded: (1) that the fire occurring within the control panel was an "ensuing fire," and (2) that all of the damage to the building, seventy per cent of that to the control panel and all of the damage to the furnaces resulted from the "ensuing fire." We believe its conclusions were proper.

**(1)** *The fire occurring within the control panel was an "ensuing fire."*

We are convinced that the "fire" that co-existed with the electrical disturbance from the first through the tenth to thirtieth second, was an "ensuing fire" within the meaning of the policies. In so holding, we join the District Court in rejecting the insurers' contention that a fire only becomes an ensuing one after the termination of the electrical disturbance (i. e., the electrical current interrupted).

"Ensuing fire" is neither defined in the policy, compare, Niagara Mohawk Power Corp. v. Aetna Ins. Co., 15 App.Div.2d 390, 224 N.Y.S.2d 536 (1962), nor the subject of construction by the Minnesota Supreme Court. We

---

2. After the appraisers had determined the damage to the building and the control panel, Commercial argued that the amount of potential recovery in the suit against them had fallen below the jurisdictional amount of $10,000. The court properly rejected the contention, relying primarily on St. P. Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 (1938). The court noted that there was little chance that the claim was fictionally overstated to invoke federal jurisdiction since it was on the defendant's initiative that the federal court had assumed jurisdiction.

must, therefore, attempt to determine the meaning that the Minnesota court would give to it.[3] In so doing, we follow the guidelines of that court. LeRoux v. Edmundson, 276 Minn. 120, 148 N.W.2d 812 (1967); Benson v. Continental Cas. Co., 275 Minn. 544, 146 N.W.2d 358 (1966); Lang v. General Insurance Company of America, 268 Minn. 36, 127 N.W. 2d 541 (1964). These guidelines were summarized in *Lang.* We restate the relevant ones here:

"'* * * [A]s the language of an insurance policy is that of the insurer, any reasonable doubt as to its meaning must be resolved in favor of the insured, but the court has no right to read an ambiguity into plain language of an insurance policy in order to construe it against the one who prepared the contract.

 * * * * * *

"'* * * Where there is no ambiguity there is no room for construction. In such cases, the parties being free to contract, the language used must be given its usual and accepted meaning. "'* * * Contracts of insurance, like other contracts, must be construed according to the terms the parties have used, to be taken and understood, in the absence of ambiguity, in their plain, ordinary, and popular sense, so as to give effect to the intention of the parties as it appears from the entire contract.

 * * * * * *

"'* * * A policy and endorsements should be construed, if possible, so as to give effect to all provisions, * * *.' "

Id. at 544.

(a) *The words in the phrase "ensuing fire" should be given their plain and ordinary meaning.*

■ "Fire" is defined [4] as a "phenomenon of combustion manifested in light, flame, and heat." [5] Webster's Seventh New Collegiate Dictionary (1965). It has been defined by a number of courts, including this one, as combustion accompanied by heat and light. Western Woolen Mill Co. v. Northern Assur. Co., 139 F. 637 (8th Cir. 1905); Sun Insurance Office of London v. Western Woolen Mill Co., 72 Kan. 41, 82 P. 513 (1905); Security Ins. Co. of N. H., Conn. v. Choctaw Cotton Oil Co., 149 Okl. 140, 299 P. 882 (1931).

It is conceded by the parties that a "fire" existed within the first second after the electrical arcing began. The question thus becomes whether it was an "ensuing fire."

"Ensue" is defined:

"* * * 2. to follow as a consequence; result." The Random House Dictionary of the English Language, The Unabridged Edition (1966).

"To follow as a chance, likely or necessary consequence: to take place afterwards." Webster's Unabridged Dictionary (1961).

■ On the basis of these definitions, we view an ensuing fire as one which follows as a consequence of an electrical disturbance or injury caused by electrical current artificially generated. Whether an electrical current continues after a fire is ignited is, in our judgment, immaterial. The only question that can be

---

**3.** This being a diversity case, we apply the law in which the District Court sat—Minnesota. Erie Rd. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The parties agree that Minnesota would apply its own law.

**4.** In the absence of a definitional clause, it is proper for the Court to consider the dictionary meaning of the word. Lang v. General Insurance Company of America,

268 Minn. 36, 127 N.W.2d 541, note 2 (1964).

**5.** There is some dispute as to whether a flame is a necessary element of fire. See, Lavitt v. Hartford County Mut. Fire Ins. Co., 105 Conn. 729, 136 A. 572 (1927). Here, substantial evidence supports the District Court's finding that the bakelite insulators and insulation on the conductors were in flame within the first second after the arcing began.

reasonably asked is: At what point does electrical arcing cause a fire to come into being? This point is obviously the moment at which combustion accompanied by heat and light occurs. Here, that point was within the first second after the arcing occurred.

To the extent that the jury charge as quoted in South Carolina Electric & Gas Co. v. Aetna Ins. Co., 238 S.C. 248, 120 S.E.2d 111 (1961), might be read to contain any language to the contrary, we decline to engraft it on Minnesota law.

(b) *The "surplus words rule" does not require that the phrase be construed as to bar recovery.*

Electrical arcing is not fire. It is the movement of electrons from one point to another. Van Norstrand, International Dictionary of Physics and Electronics; Palmer, Craig and Easton, World Book Encyclopedia. It produces heat and light, but does not involve the combustion of matter. The insurers are thus correct in arguing that damage by arcing is not "loss or damage by fire"

within the terms of the policies. We believe them to be wrong, however, in insisting that if arcing causes "fire," which in turn causes damage, including damage from secondary arcing, that the damage caused by the fire is not compensable. They urge that unless the policy is construed so as to reach that result, the electrical apparatus clause is pure surplusage, and that such a result is to be avoided.[6]

While we do not minimize the importance of the rule, we cannot apply it to the exclusion of other rules of construction, nor can we apply it to alter the plain meaning of the clause. To apply it here in the manner urged by the insurers would do precisely that, particularly in light of the meaning that we give to the word "ensuing."

Nor do we agree that the meaning we give the clause strips it of all significance. It is, at the very least, a clarifying clause that spells out the responsibility of the insurer where "electrical" damage and "fire" damage both result from an electrical disturbance.[7]

6. In Lang v. General Insurance Company of America, 127 N.W.2d at 544, the court stated:
"'* * * A policy and endorsements should be construed, if possible, so as to give effect to all provisions, * * *.'" Cf., Hogg, The International Court: Rules of Treaty Interpretation, 43 Minn. L.Rev. 369, 44 Minn.L.Rev. 5, 11 (1959).

7. The wording of a standard explosion exclusion clause is similar to that of the electrical apparatus clause in the policies under consideration. Couch explains the operation of such clauses:
*"Meaning of 'loss by explosion.'*
"* * * This phrase ['loss by explosion'] has been variously interpreted. It has been interpreted as excluding (1) fires which result from explosions * * *." Couch, Insurance, § 42:513 (2d ed.1963) (footnote omitted).
*"Meaning of loss by explosion 'unless fire ensues.'*
"In order to avoid the question of construction which arises where an exception is stated merely in terms of 'loss resulting from explosion,' it is common to add the qualification 'unless fire ensues' and then specify that recov-

ery is limited to the damage caused by the fire only.
"Such provisions restate the insurer's liability for fire loss although caused by an explosion, and the limitation that it is not liable for an explosion which is not caused by fire. Thus under provisions of this kind the general rule is that the insurers are not liable for any damage to the insured property caused by an explosion which is not preceded by a fire which caused it, or of which it is an incident, but only for the actual fire damage following the explosion; whereas if a fire precedes the explosion, and causes it, then the entire damages caused by both the fire and the explosion are damages by fire, and within the risk insured against. * * *." Couch, Insurance, § 42:519 (2d ed.1963) (footnotes omitted).
Consider also:
"* * * [T]he usual provision in a fire insurance policy excepting from the coverage any loss caused by an explosion unless fire ensues affirms the insurer's liability for loss by fire ensuing upon an explosion; in this situation the insurer is liable for the damage by fire only, and not for that caused by the explosion.

(c) *The parties did not intend to exclude all damage to the electrical wiring and apparatus at the locus of the malfunction.*

As difficult as it may be to distinguish between damage caused by electrical arcing and that caused by an ensuing fire where such damage is at or near the location of the malfunction, an insured is entitled to recover for it to the extent proved.

Had the insurers intended to exclude fire damage at the locus of the malfunction, it could have done so.[8] See, United States Fire Ins. Co. v. Universal Broadcast. Corp., 205 Ark. 115, 168 S.W.2d 191 (1943); Fidelity Phoenix Fire Ins. Co. v. Two States Telephone Co., 289 S.W. 726 (Tex.Civ.App.1926).

Finally, we note that a fire policy is intended to cover every loss proximately caused by fire and every loss flowing directly from such peril, Fogarty v. Fidelity & Casualty Company, 122 Conn. 245, 188 A. 481, 483 (1936); Appleman, Insurance Law and Practice, § 3082, and that exceptions which an insurer desires to enforce should be plainly expressed. Wausau Telephone Co. v. United Firemen's Ins. Co., 123 Wis. 535, 101 N.W. 1100 (1905). In our view, the exception here does not plainly except any fire damage which occurred.

(2) *Damages to the control panel and furnaces resulted from the ensuing fire.*

(a) *The control panel.*

The insured had the burden of proving the extent to which the control panel was damaged by the "ensuing fire."[9] We believe it sustained the burden of proving that at least $3,456.55 of the damage to the control panel was caused by it. In reaching this decision, we do not necessarily approve the formula used by the District Court to reach its conclusion.[10] However, since that for-

---

"* * * Where, however, a hostile fire on the insured premises precedes the explosion and the explosion is an incident thereof, and the fire is the direct and proximate cause of the injury by explosion, the general rule that an insurer, under a policy insuring against loss by fire, is liable for the entire damage to the property, it being considered under such circumstances that the entire loss is a loss by fire, has been held applicable, notwithstanding the terms of the standard exception. * * *" Annot. 82 A.L.R.2d 1125, 1128 (1962) (footnotes omitted).

8. For example, in United States Fire Ins. Co. v. Universal Broadcast Corp., 205 Ark. 115, 168 S.W.2d 191 (1943), the policy provided:

"It is a special condition of this policy that this company shall not be liable for any loss or damage to dynamos, * * * radio apparatus and other electrical appliances or devices, caused by electrical currents whether artificial or natural (including lightning), and will be liable (if covered by this policy) only for such loss or damage to them as may occur in consequence of fire outside of the machines, appliances or devices themselves."

9. In diversity actions, the burden of proof is controlled by state law. Dick v. New York Life Ins. Co., 359 U.S. 437, 446, 79 S.Ct. 921, 3 L.Ed.2d 935 (1959); American Casualty Company of Reading, Pa. v. Mitchell, 8th Cir., 393 F.2d 452, April 30, 1968. In the absence of Minnesota law in point, we adopt what appears to be the general rule. See, C. Wright, Federal Courts, 206 (1963).

Initially, the burden is on the insured to establish that a fire and loss therefrom has occurred. The insureds have met this burden. It then becomes the burden of the insurer to establish that the fire was caused by artificially generated electrical currents. Sachs v. American Central Ins. Co., 34 Misc.2d 687, 230 N.Y.S.2d 126 (1962); United States Fire Ins. Co. v. Universal Broadcast. Corp., supra. The insurer has met this burden.

Finally, it becomes the burden of the insureds to establish that even though the fire was caused by artificially generated electrical current, that a "fire ensued" and that part of the total loss was caused by the ensuing fire. Rossini v. St. Paul Fire & Marine Ins. Co., 182 Cal. 415, 188 P. 564 (1920) (En banc); German American Insurance Co. v. Hyman, 42 Colo. 156, 94 P. 27 (1908); Hallas v. North River Ins. Co. of New York, 279 App.Div. 15, 107 N.Y.S.2d 359 (1951); Dennis v. Norwich Fire Ins. Co., 50 Ohio App. 193, 197 N.E. 792 (1935).

10. "The total damage to the electrical control panel was determined by the award

mula resulted in a lesser award than appears to be justified by the evidence; we will not upset it.[11]

It is undisputed that the principal damage to the upper two-thirds of the panel was caused by "secondary electrical arcing" which rendered the branch circuit breakers in that section of the panel inoperable. What is in dispute is the cause of the secondary arcing.

The insurer's expert testified that the initial arcing produced heat which melted three copper bus bars, decomposed bakelite insulators separating the bus bars and ionized the air in the panel;[12] that this air moved from the lower to the upper part of the panel; and that the ionized air, being a good conductor, established a path for the secondary arcing which took place with resulting damage. He concluded that ninety per cent of the damage that occurred within the first ten seconds would have occurred without combustion or its by-products.

The insured's expert testified that the initial arcing produced heat which melted the main bus bars, caused the insulators, the insulation on the conductors and the plastic holders to catch "fire;" that this

fire produced flame, soot and smoke which rose to the upper portion of the panel; that the soot and smoke (carbon) established a path for the secondary arcing which took place with resulting damage; and that without the products of combustion (fire), extensive damage would not have occurred.

The insurer's expert conceded that the insured's theory was a possible one, and the insured's expert made a similar concession. The latter argued that its view was the better one: the panel was designed to avoid ionization; flame, soot and smoke were visible within the first second after the initial arcing; the upper portion of the panel was covered with soot; the insulators showed evidence of combustion rather than decomposition; and the insulation on the wiring was burned.

▪▪▪ The District Court rejected the insurer's theory and accepted that of the insured. We accept its determination. Dean Rubber Manufacturing Company v. United States, 356 F.2d 161, 167 (8th Cir. 1966); John Blue Co. v. Dempster Mill Mfg. Co., 275 F.2d 668, 673 (8th Cir. 1960); Svenson v. Mutual Life Ins. Co.

---

of the appraisers and umpire to be $4,-735.00. The evidence indicated that during the first ten seconds after the electrical arcing began the control panel sustained ninety percent of its damage. The evidence also indicated that an independent, self-sustaining fire commenced within three seconds after the electrical arcing began. The Court is of the opinion that whatever damage occurred during the first three seconds, before the self-sustaining fire commenced, could be considered the result of the electrical injury. Although the damage which occurred during the first ten seconds may have started slowly and increased at a progressive rate after the self-sustaining fire started, there is no evidence from which any accurate measurement of this can be made. The Court feels that it would not be unreasonable to attribute thirty percent of the damage occurring within the first ten seconds to the electrical injury.

"Adopting this formula, the Court finds that the damage to the electrical control

panel should be apportioned: $1,278.45 to electrical damage, and $3,456.55 to fire damage."

11. We note that the insured has not cross-appealed. Southern Agency Company v. LaSalle Casualty Company, 8th Cir., 393 F.2d 907, April 23, 1968.

12. "7. *Gases in the Normal State Conduct Electricity Only to a Slight Degree.* A gas may be put in the conducting state by different means, such as raising its temperature; drawing it from the neighborhood of flames, arcs, or glowing metals; or drawing it from a space in which an electric discharge is passing. This conductivity is due to free electrons. The process by which a gas is made into a conductor is called the ionization of the gas. The movement of free electrons constitutes the current through the gas."
H. Dwight, Standard Handbook for Electrical Engineers, Knowlton, Editor, p. 31–32 (8th ed.1948) (footnote omitted).

of New York, 87 F.2d 441, 445 (8th Cir. 1937).

Under this view of the evidence, the only direct damage caused by the electrical current was the melting of the copper bus bars and the destruction of the main circuit breakers. No one argues that this damage approaches thirty per cent of the total. The remaining damage was as a direct result of the electrically induced fire and was clearly compensable under the terms of the policy. See, footnote 7, supra.

(b) *The electric furnaces.*

The trial court found that "damage to the two furnaces was loss directly resulting from the ensuing fire and the heavy smoke and soot issuing therefrom." This finding was based on testimony of the insured's expert that had the branch circuit breakers not been rendered inoperable by the ensuing fire, and had the smoke and soot not been deposited in the panel, that power could have been restored to the furnaces within two hours after the incident and the furnaces saved. The insurer does not challenge these assertions; it rather relies on its expert's theory that the major damage to the panel was not caused by fire.

For reasons previously stated, we accept the trial court's findings.

 The insurer also argues that the damage to the furnace should have been apportioned on the same formula as damage to the panel. We do not agree. The trial court's finding that but for the ensuing fire, power could have been restored is supported by substantial evidence and must be accepted by us. This being true, the insurer is required to indemnify the insured for the entire loss to the furnaces.

 Nor is there, as suggested by the insurer, a question as to whether the fire in the control panel was the proximate cause of the damage to the furnaces. See, Lipshultz v. General Ins. Company of America, 256 Minn. 7, 92 N.W.2d 880 (1959); Mork v. Eureka-Security Fire & Marine Ins. Co., 230 Minn. 382, 42 N.W.2d 33 (1950); Russell v. German Fire Ins. Co., 100 Minn. 528, 111 N.W. 400 (1907).

*Russell* cited Lynn Gas & Electric Co. v. Meriden Fire Ins. Co., 158 Mass. 570, 33 N.E. 690 (1893), with approval. In the latter case, a fire in one portion of the building short-circuited a power line. The short circuit, in turn, caused mechanical stress to machinery located in a remote portion of the building to which the fire itself did not spread. The court held that the fire was the proximate cause of the mechanical damage. Compare, North River Ins. Co. v. Clark, 80 F.2d 202 (9th Cir. 1935).

In *Mork*, the insured risk was loss by explosion. An explosion in a furnace blew open the doors causing the furnace to go out and the plumbing and radiators to freeze. The court held that the explosion was the proximate cause of the damage to the plumbing and radiators.

In *Lipshultz*, the insured risk was loss windstorm. A windstorm caused a power outage and an interruption of refrigeration in the insured's store (The power line was downed one-half mile from the insured's store.). The interruption of refrigeration resulted in the loss of perishable food stuffs. The court held that the windstorm was the proximate cause of the loss of the food stuffs.

We have carefully reviewed the other contentions made by the appellants and find them to be without merit.